## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2008 DEC 24  A 11: 17

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| ROBERT HOCHSTADT and EDWARD HAZELRIG, JR., on behalf of themselves, the Boston Scientific Corp. 401(k) Corp. Retirement Savings Plan, and all others similarly situated, | Civil Action No.: |
| **Plaintiffs,** | |
| -against- | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA** |
| BOSTON SCIENTIFIC CORP., ADMINISTRATIVE AND INVESTMENT COMMITTEE OF BOSTON SCIENTIFIC CORP., JAMES R. TOBIN, PETER M. NICHOLAS, JOHN E. ABELE, JOEL E. FLEISHMAN, ERNEST MARIO, Ph.D., UWE E. REINHARDT, JOHN E. PEPPER, URSULA M. BURNS, MARYE ANNE FOX Ph.D., RAY J. GROVES, N.J. NICHOLAS, JR., SENATOR WARREN B. RUDMAN, LAWRENCE C. BEST, ROBERT G. MacLEAN, LUCIA L. QUINN, PAUL W. SANDMAN, RICHARD A. DUFFY, WARREN CLARK III, ROSE MARIE BRANA HASLINGER, JAMIE RUBIN and JOHN and JANE DOES 1-10 (BEING CURRENT AND FORMER MEMBERS OF THE ADMINISTRATIVE AND INVESTMENT COMMITTEE OF BOSTON SCIENTIFIC CORP.), | |
| **Defendants.** | |

Plaintiffs Robert Hochstadt and Edward Hazelrig, Jr. ("Plaintiffs"), on behalf of themselves, the Boston Scientific Corporation 401(k) Retirement Savings Plan (the "Plan"), and a class of all other similarly situated participants and beneficiaries of the Plan (collectively, the "Participants"), allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action against Boston Scientific Corporation ("Boston Scientific" or the "Company") and others for Plan-wide relief on behalf of the Plan, and on behalf of a class of Participants for whose individual accounts the Plan held an interest in Boston Scientific common stock at any time between May 7, 2004 and January 26, 2006, inclusive (the "Class" and the "Class Period"). This is as a civil enforcement action under the Employee Retirement Income Security Act ("ERISA") §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), for relief on behalf of the Plan.

2.      The Plan is operated and established by Boston Scientific as a benefit for its employees to permit tax-advantaged savings for retirement. At all times relevant to the Class Period, Boston Scientific common stock was one of the investments that Participants could choose. According to the Plan's Form 11-K filed with the Securities and Exchange Commission ("SEC") on June 28, 2005, more than $195 million of the Plan's $595 million or more in assets were invested in Boston Scientific common stock ("Boston Scientific Stock" or "Company Stock"). Plaintiffs were Participants in the Plan during the Class Period and their respective individual Plan accounts included Boston Scientific Stock.

3.      During the Class Period, Defendants, as fiduciaries of the Plan, breached their duties to the Plan and to the Participants in violation of ERISA, particularly with regard to the Plan's holdings of Boston Scientific Stock.

4.      Since the Plan's holdings in Boston Scientific Stock comprised a significant percentage of the overall value of the assets held by the Plan, the long-term retirement savings of the Participants were dependent to a substantial degree both on the performance of Boston Scientific Stock, as well as the related need for prudent fiduciary decisions by Defendants concerning such a large, ongoing investment of Plan's assets.

2

5.      This action alleges, among other things, that the fiduciaries of the Plan breached their fiduciary duties to the Plan and the Participants under ERISA, by, *inter alia*, selecting and maintaining Company Stock as an investment alternative for participant contributions, including Company-matched contributions, when it was no longer a suitable or prudent investment option. The breaches were ongoing and arose out of Defendants' continuing duties to review, evaluate, and monitor the suitability of the Plan's investment in Boston Scientific Stock, and to, as Plaintiffs further allege, provide accurate material information to enable Participants to make informed investment decisions concerning their contributions invested in Company Stock.

6.      As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plan suffered substantial damages, including the erosion of millions of dollars of Participants' retirement savings. Indeed, the Participants have seen their retirement savings accounts devastated as Company Stock plummeted from a high of approximately $45 per share during the Class Period to a low of approximately $20 per share at the end of the Class Period. In total, the value of Boston Scientific Stock decreased by approximately fifty percent from its Class Period high. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from these fiduciary breaches.

### JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e) (1), 29 U.S.C. § 1132(e) (1).

8.      This Court has personal jurisdiction over Defendants under ERISA § 502(e) (2), 29 U.S.C. § 1132(e) (2), as one or more of the Defendants may be found in this District. The Court also has personal jurisdiction over Defendants because the Company maintains its corporate headquarters in this District, and the Plan is administered within this District.

Defendants systematically and continuously have done and continue to do business in this District, and this case arises out of Defendants' acts within this District.

9.      Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants administer the Plan in this District, some or all of the actionable conduct for which relief is sought occurred in this District, and one or more of the Defendants reside or may be found in this District. In addition, the Company maintains its corporate headquarters in this District.

## THE PARTIES

**A.    Plaintiffs**

10.      During the Class Period, Plaintiff Robert Hochstadt was a Participant in the Plan, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. 1102(7) and 1132(a), and held Boston Scientific Stock in his individual Plan account.

11.      During the Class Period, Plaintiff Edward Hazelrig, Jr. was a Participant in the Plan, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. 1102(7) and 1132(a), and held Boston Scientific Stock in his individual Plan account.

**B.    Defendants**

12.      Each of the Defendants named herein are fiduciaries of the Plan within the meaning of ERISA.

### *Boston Scientific*

13.      **Defendant Boston Scientific is** a Delaware corporation with its principal executive offices located at One Boston Scientific Place, Natick, Massachusetts, 01760. During the Class Period, Boston Scientific Stock traded on the New York Stock Exchange. The Company is a developer and manufacturer of medical devices whose products are used in the cardiovascular and endosurgery health care arena. The products are used to: enlarge narrowed

4

blood vessels to prevent heart attack and stroke; clear passages blocked by plaque to restore blood flow; open obstructions and bring relief to patients suffering from various forms of cancer; perform biopsies and intravascular ultrasounds; map electrical problems in the heart; place filters to prevent blood clots from reaching the lungs, heart or brain; treat urological, renal, pulmonary, neurovascular and gastrointestinal diseases; and modulate nerve activity to treat deafness and chronic pain. Boston Scientific is the Plan's sponsor and, as explained in more detail below, had fiduciary responsibilities over the Plan.

14.      During the Class Period, Boston Scientific was the employer, sponsor and named and/or *de facto* fiduciary of the Plan. Boston Scientific, at all applicable times, exercised control over the activities of its directors, officers and employees that performed fiduciary functions with respect to the Plan, including the Boston Scientific Director Defendants (defined below) and the Boston Scientific 401(k) Administrative and Investment Committee (also defined below). The Company could hire, terminate and/or replace a director or a member of the committee at will. As a matter of corporate law, Boston Scientific is imputed with the Defendants' knowledge of the misconduct alleged herein.

### *Boston Scientific Director Defendants*

15.      **Defendant James R. Tobin** ("Tobin") was, at all relevant times during the Class Period, President, Chief Executive Officer and a Director of Boston Scientific. Tobin was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan, the management and disposition of the Plan's assets, as well as the selection of a committee of individuals to serve at the pleasure of the Board of Directors (the "Board") to administer the plan. Defendant Tobin, along with other defendant executive officers, as set forth below, personally benefited by the exercise of executive stock options and related sale of Boston Scientific Stock at artificially inflated prices during the

5

Class Period. Tobin signed the Company's Forms 10-K filed with the SEC on March 15, 2005 and March 1, 2006.

16.     **Defendant Peter M. Nicholas** ("Nicholas") is a co-founder of Boston Scientific and has served as Chief Executive Officer from 1979 to March 1999; Co-Chairman of the Board from 1979 to 1995 and Chairman of the Board since 1995; and as a Director since 1979. Nicholas was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets, as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plan.

17.     **Defendant John E. Abele** ("Abele") is a co-founder of Boston Scientific and has served as a Director since 1979. Abele served as Treasurer from 1979 to 1992, as Co-Chairman from 1979 to 1995 and as Vice-Chairman and Founder, Office of the Chairman from February 1995 to March 1996. Abele was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plan.

18.     **Defendant Joel E. Fleishman** ("Fleishman") has served as a Director of the Company since 1992. Fleishman is a Professor of Law and Public Policy at Duke University and a founding member of the governing board of the Duke Center for Health Policy Research and Education. Fleishman was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plan.

6

19. **Defendant Ernest Mario, Ph.D.** ("Mario") has served as a Director of Boston Scientific since October 2001. Currently Chairman and Chief Executive Officer of Reliant Pharmaceuticals, LLC, Mario has also served in an executive capacity at other pharmaceutical companies. In addition, Mario is Chairman of the Board of Duke University Health System. Mario was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plan.

20. **Defendant Uwe E. Reinhardt** ("Reinhardt") has served as a Director of Boston Scientific since 2002. Reinhardt also serves as a Trustee of the Duke University Health System and a member of the United States Department of Health and Human Services. Reinhardt was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plan.

21. **Defendant John E. Pepper** ("Pepper") has served as a Director of Boston Scientific since 2003, and previously, from November 1999 to May 2001. Pepper was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plan.

22. **Defendant Ursula M. Burns** ("Burns") has served as a Director of Boston Scientific since 2002 and as a member of the Executive Compensation and Human Resources

Committee throughout the Class Period.[1] Burns was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plan.

23.   **Defendant Marye Anne Fox, Ph.D.** ("Fox") has served as a Director of Boston Scientific since October 2001. Fox is the Co-Chair of the National Academy of Sciences' Government-University-Industry Research Roundtable and serves on President Bush's Council of Advisors on Science and Technology. She also serves as a member of the Board of Directors of W.R. Grace Co., a specialty chemical company that filed petition for reorganization under the bankruptcy code in April 2001. Fox was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plan.

24.   **Defendant Ray J. Groves** ("Groves") has served as a Director of Boston Scientific since 1999 and as a member of the Executive Compensation and Human Resources Committee throughout the Class Period. Groves was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plan.

---

[1] According to its charter, the Executive Compensation and Human Resources Committee is charged with recommending adjustments to, administering and maintaining a well-informed overview of, among other things, the Company's employee benefits plans.

8

25.    **Defendant N.J. Nicholas, Jr.** ("Nicholas, Jr.") has served as a Director of Boston Scientific since October 1994. Nicholas, Jr. has served as a member of the President's Commission on Environmental Quality. Nicholas, Jr. is the brother of Peter Nicholas (*see* ¶ 18), Chairman of the Board of the Company. Nicholas, Jr. was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plan.

26.    **Defendant Senator Warren B. Rudman** ("Senator Rudman") has served as a Director of Boston Scientific since October 1999 and as a member of the Executive Compensation and Human Resources Committee throughout the Class Period. Senator Rudman was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the plan.

27.    Defendants Tobin, Nicholas, Abele, Fleishman, Mario, Reinhardt, Pepper, Burns, Fox, Groves, Nicholas, Jr. and Senator Rudman are referred to as the "Director Defendants." As set forth above, the Director Defendants were charged with the responsibility to select a committee of individuals to administer the Plan.

### *Boston Scientific Administrative and Investment Committee Defendants*

28.    Boston Scientific has designated **Defendant 401(k) Administrative and**

**Investment Committee** (the "Committee")[2] as the entity responsible for meeting the objectives set out by the Investment Policy Statement (the "Policy") (*see* Exhibit E).  The Policy's objectives are to:

      a.      Provide a mechanism to establish and review the Plan's investments goals and objectives;

      b.      Provide the basis for future investment performance measurement and evaluation;

      c.      Identify those individuals within the Company responsible for selecting and reviewing the investment options available under the Plan;

      d.      Designate the investment options available to participants with a clear understanding of the role each investment option performs;

      e.      Identify the criteria that will be used for selecting the Plan's investment options and evaluating the continued appropriateness of each investment option; and

      f.      Assist the Committee in satisfying its fiduciary responsibilities with respect to the selection and monitoring of the Plan's investment options.

---

[2] The Company identifies the existence of the Committee in its Forms 11-K filed with the SEC on June 28, 2005 and June 29, 2006 for the fiscal years ended December 31, 2004 and December 31, 2005, respectively (attached hereto as Exhibits A and B).  Defendants identify the members of the Committee in a letter response to Plaintiffs' counsel in *In Re Boston Scientific Corp. ERISA Litig.*, Master File No. 1:06-cv-10105-JLT (D. Mass., filed Aug. 23, 2006), dated May 4, 2006 (attached hereto as Exhibit C).  However, the Boston Scientific Benefit Program Summary Plan Descriptions, dated June 2005 (relevant portions attached hereto as Exhibit D), identify the "401(k) Retirement Savings Plan Committee" as the entity responsible for administration of the Plan (*see* Exhibit C at 156) and the Investment Policy Statement for the Plan, amended as of April 1, 2004 (attached hereto as Exhibit E), identifies the "Investment Committee" as responsible for the Plan's investments (*see id.* at 1).  Plaintiffs reserve their rights to amend the Complaint should these or other committees exist and serve similar and/or overlapping functions, and their members are likewise identified as named fiduciaries.

29.     The Company has designated the Committee as the "identified plan fiduciary." The Committee is responsible for compliance with section 404(c) of ERISA.   It is also responsible for administration of the Plan's assets as well as their investment.  The Committee is charged with selecting the Plan's investment options in a manner consistent with its fiduciary duties under ERISA.  The members thereof are to make such selections with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.  According to Plan documents, the selections of investment options are to be made for the sole benefit of Participants.

30.     The Board of Directors appoints and monitors the members of the Committee.  As of April 1, 2004, the Policy held that the Committee consists of *ex officio* representatives from the Company's Human Resources, Finance and Legal departments.[3]  The Committee and its respective members were fiduciaries of the Plan in that they exercised discretionary authority with respect to its management and administration as well as its management and disposition of assets.  The Committee is also a named fiduciary of the Plan.  The Committee is made up of the following executive officers of Boston Scientific: Lawrence C. Best, Robert G. MacLean, Lucia L. Quinn, Paul Sandman, Richard Duffy, Warren Clark III, Rose Marie Brana Haslinger and Jamie Rubin.

[3] The Policy, amended as of April 1, 2004, stated that the "current members of the Committee are the:  Chief Financial Officer; Senior Vice President of Human Resources; Vice President of Human Resources; Senior Vice President, General Counsel; and Vice President, HR Business Programs and Services."  Although contemporaneous SEC filings identified only three of these positions as being occupied throughout the Class Period -- Chief Financial Officer; Executive Vice President of Human Resources; and Executive Vice President, Secretary and General Counsel -- Plaintiff relies upon Defendants' letter representations as set forth in note 2, *supra*, and allege the members of the Committee, accordingly.

11

31.     **Defendant Lawrence C. Best** ("Best") served as Executive Vice President –
Finance & Administration, Chief Financial Officer and a member of the Committee during the
Class Period.  Best signed the Plan's Forms 11-K annual report submissions to the SEC for the
fiscal years ended December 31, 2004 ("2004 11-K"); and December 31, 2005 ("2005 11-K") in
his capacity as member of the Committee as well as the Form S-8 registering Company Stock for
use by the Plan filed with the SEC on December 10, 2003.  Best also sat on the Appeals
Committee that reviewed claims that were adversely determined.  Best was a fiduciary of the
Plan within the meaning of ERISA in that he exercised discretionary authority with respect to
management and administration of the Plan and management and disposition of the Plan's assets.
Defendant Best also personally benefited by the exercise of executive stock options and related
sale of Boston Scientific Stock at artificially inflated prices during the Class Period.  Best signed
the Company's Forms 10-K filed with the SEC on March 15, 2005 and March 1, 2006.

32.     **Defendant Robert G. MacLean** ("MacLean") served as Executive Vice
President – Human Resources of the Company and was a member of the Committee during the
Class Period until on or about March 30, 2005 when he retired from Boston Scientific.  MacLean
signed the 2002 11-K in his capacity as a member of the Committee.  MacLean was a fiduciary
of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect
to management and administration of the Plan and management and disposition of the Plan's
assets.  Defendant MacLean also personally benefited by the exercise of executive stock options
and related sale of Boston Scientific Stock at artificially inflated prices during the Class Period.

33.     **Defendant Lucia L. Quinn** ("Quinn") was appointed Executive Vice President,
Human Resources following Defendant MacLean's retirement and was a member of the
Committee from about March 2005 to the end of the Class Period.  From January 2005 to March

2005, Quinn served as Senior Vice President and Assistant to the President. Quinn was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets.

34.    **Defendant Paul W. Sandman** ("Sandman") served as Executive and Senior Vice President and Secretary and General Counsel of Boston Scientific since 2004, and he was a member of the Committee during the Class Period. Sandman also sat on the Appeals Committee which reviewed claims that were adversely determined. Sandman was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets. Defendant Sandman also personally benefited by the exercise of executive stock options and related sale of Boston Scientific Stock at artificially inflated prices during the Class Period.

35.    **Defendant Richard A. Duffy** ("Duffy") served as Director of Global Benefits at Boston Scientific and was a member of the Committee during the Class Period. As Director of Global Benefits, Duffy was charged with processing claims for benefits. Duffy also sat on the Appeals Committee which reviewed claims that were adversely determined. Duffy signed the Forms 5500 on behalf of the Company for the years ended December 31, 2003 and December 31, 2004 in his capacity as "Plan Administrator." Duffy was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets.

36.    **Defendant Warren Clark III** ("Clark") served as Vice President and Group Controller at Boston Scientific and was a member of the Committee during the Class Period. Clark also sat on the Appeals Committee which reviewed claims that were adversely determined.

Clark was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets.

37.   **Defendant Rose Marie Brana Haslinger** ("Haslinger") served as a member of the Committee during the Class Period. Haslinger was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets.

38.   **Defendant Jamie Rubin** ("Rubin") served as Vice President, Human Resources and was a member of the Committee during the Class Period. Rubin also sat on the Appeals Committee which reviewed claims that were adversely determined. Rubin was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and management and disposition of the Plan's assets.

39.   **Defendants John and Jane Does 1-10**. Plaintiffs do not currently know the identity of all Committee members during the Class Period. Therefore, some of the members of the Committee are named fictitiously, as Defendants John and Jane Does 1-10. Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names.

## CLASS ACTION ALLEGATIONS

40.   Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves, the Plan and a Class consisting of all Participants, whose individual accounts included investments in Boston Scientific Stock during the Class Period of May 7, 2004 to January 26, 2006, inclusive. Excluded from the Class are Defendants, members of the Defendants' immediate families, any officer, director, or partner of any Defendant, any entity in which a Defendant has a controlling interest, and the heirs, successors, or assigns of any of the foregoing.

41.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there were hundreds, if not thousands, of present and former employees of Boston Scientific who held shares of Boston Scientific Stock in their individual accounts under the Plan.

42.    Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)    Whether Defendants were fiduciaries;

        (b)    Whether Defendants breached their fiduciary duties;

        (c)    Whether the Plan and the Participants were injured by such breaches; and

        (d)    Whether the Class is entitled to damages and injunctive relief.

43.    Plaintiffs' claims are typical of the claims of the other members of the Class, as Plaintiffs and all members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

44.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained able counsel with experience in ERISA class action litigation. The interests of Plaintiffs are coincident with and not antagonistic to the interests of the other Class members.

45.    Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants. In addition, adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the

other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

46.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## NATURE OF THE PLAN

47.    The Plan is an "employee pension benefit plan" within the meaning of ERISA. § 3(2)(A), 29 U.S.C. § 1002(2)(A).  Further, it is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).  While the Plan is not a party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

48.    At all relevant times, the Plan had two separate components:  (1) a contributory portion, which consisted of Participant contributions, and (2) a matching component, which consisted entirely of employer contributions.

### *The Plan Documents*

49.    ERISA requires that every participant in an employee benefit plan be given a Summary Plan Description ("SPD").  The most recent SPD available is the Boston Scientific Benefit Program Summary Plan Descriptions, dated June 2005 (*see* Exhibit D).  The SPD constitutes the Prospectus for the Plan.

50.    ERISA and the Internal Revenue Code require that plans file an Annual Report,

Form 5500, with the Department of Labor and the Department of the Treasury. The assets of an employee benefit plan, such as the Plan, must be "held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the Plans were held in trust pursuant to a trust agreement. *See, e.g.*, July 1, 1997 Trust Agreement entered into between Vanguard Fiduciary Trust Agreement and Boston Scientific Corporation (attached hereto as Exhibit F).

### *Plan Description and Provisions*

51.     The Plan was originally adopted by Boston Scientific, effective January 1, 1987. The Plan is identified in its SPDs as Plan I.D. Number 001, and the Plan Year is January 1 to December 31. The Vanguard Group handles the day-to-day administration of the Plan.

52.     According to the SPDs in effect during the Class Period, Boston Scientific purportedly "recognize[d] the importance of saving for retirement." Moreover, the Plan "offer[ed] [Participants] one of the best ways to save, so that [they would] be prepared when the future arrives." Additionally, the Plan "offer[ed] [Participants] a way to build [their] financial security."

53.     Throughout the Class Period, eligible Participants[4] could contribute between 1% and 25% of their pre-tax annual compensation. Participants could also contribute between 1% and 10% of their compensation on an after-tax basis each year. Moreover, effective January 1, 2005, the Company provided a matching contribution equal to 200% of the employee's contribution for up to 2% of the employee's earnings, plus 50% of the next 4% of the employee's earnings, not to exceed 6% of the Participant's compensation. During the Class Period, the Plan

---

[4] The Plan requires that its Participants be at least eighteen years old, as well as employees for thirty days of service. Prior to July 1, 2004, the minimum age requirement was twenty-one years of age.

17

offered approximately ten separate investment options including the Boston Scientific Corporation Common Stock Fund ("Boston Scientific Stock Fund" or "Company Stock Fund").

54.     According to the SPD, Boston Scientific incorporates by reference its Forms 10-K, annual reports, all other reports filed or subsequently filed pursuant to Section 13(a), 13(c), 14 or 15(d) or the Securities Exchange Act of 1934, as amended, and the description of its Common Stock contained in Boston Scientific's Registration Statement on Form S-8 filed on December 10, 2003 (the "SEC Filings").     Therefore, the Company's SEC Filings were fiduciary communications.

55.     As of December 31, 2003, the Boston Scientific Stock Fund held 5,545,660 shares of Company Stock with a then-current market value of $203,858,448. As of December 31, 2003, this very substantial holding represented 41% of the Plan's total assets.

56.     As of December 31, 2004, the Boston Scientific Stock Fund held 5,486,766 shares of Company Stock with a then-current market value of $195,054,514. As of December 31, 2004, this very substantial holding represented 34% of the Plan's total assets.

57.     As of December 31, 2005, the Boston Scientific Stock Fund held 5,631,921 shares of Company Stock with a then-current market value of $137,925,737. As of December 31, 2004, this very substantial holding represented 19.5% of the Plan's total assets.

58.     While the percentage of Plan assets invested in Company Stock has declined during the Class Period, the decline appears to be attributable to the significant decline in the value of Boston Scientific Stock during the Class Period, rather than any meaningful decrease in the amount of shares of Company Stock held in the Plan for the benefit of the Participants.

59.     The Plan is an employee benefit plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

60.     Boston Scientific is the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

## DEFENDANTS' FIDUCIARY STATUS

### *The Nature of Fiduciary Status*

61.     *Named Fiduciaries.*  ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  The person named "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

62.     *De Facto Fiduciaries.*  ERISA treats as fiduciaries not only persons explicitly names as fiduciaries under ERISA § 402(a)(1) but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."   ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

63.     Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and the Participants under ERISA in the manner and to the extent set forth in the Plan's documents, through his or her conduct, and under ERISA.

64.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan, as well as the Plan's investments, solely in the interest of the Participants.  As fiduciaries, Defendants were required to act with the care, skill

19

prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

65.    Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent fiduciary discretion and authority were assigned to or exercised by each of them, and as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

66.    ERISA permits the fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries must still act solely in the interest of participants and beneficiaries, not in the interest of the sponsor.  Moreover, all fiduciaries of the Plan were obliged, when wearing their fiduciary hat(s), to act independently of Boston Scientific which had no authority under the governing Plan's documents to direct the conduct of any of them with respect to the Plan, investments therein, or the disclosure of information between and among fiduciaries of from fiduciaries to the Participants.

### *Boston Scientific*

67.    As set forth above, Boston Scientific is responsible for appointing, removing and monitoring the Committee, the Plan's Trustee, and any and all other persons to whom it assigned fiduciary responsibility. *See* Exhibit D at 156.

68.    If Boston Scientific did not designate the Committee to serve as the Plan Administrator for the Plan, for example, then pursuant to the Plan's documents, the Company served as the Plan's Administrator. *Id.* at 157.  As Plan Administrator, the Committee has discretionary authority to determine all matters relating to eligibility, coverage, and benefits

under the Plan.

69.     Through the Director Defendants and the Committee Defendants, Boston Scientific, at all applicable times, exercised control over the activities of its officers and employees that performed fiduciary functions with respect to the Plan. The Company could hire, terminate and replace such employees at will. Boston Scientific is therefore responsible for the activities of its officers and employees through principles of agency and *respondeat superior* liability.

70.     As a matter of corporate law, Boston Scientific is imputed with the knowledge that the Defendants, including Defendants Tobin, Best and Sandman, had of the misconduct alleged herein, even if not communicated to Boston Scientific.

71.     In light of the foregoing duties, responsibilities and actions, Boston Scientific was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control with respect to the management of the Plan, exercised authority or control with respect to the management or disposition of the Plan's assets and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

72.     Boston Scientific, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, the Company relied and continues to rely directly on the Board and the members of the Committee to carry out its fiduciary responsibilities under the Plan and ERISA.

### *Boston Scientific Director Defendants*

73.     Under Delaware law and Boston Scientific's charter and bylaws, the Boston Scientific Board of Directors had the authority to manage the business and affairs of Boston Scientific. Because the Company was, as alleged above, a fiduciary of the Plan during the Class

21

Period, thus so were the Director Defendants who, as members of the Board, had the ultimate authority for the affairs of Boston Scientific. In particular, Boston Scientific, as alleged above, had the authority to select the members of the Committee (which, in turn, had the authority to prudently select, suspend, eliminate and/or reduce investment funds, including the Boston Scientific Stock Fund, in the Plan) as well as appoint, remove and monitor the members of the Committee. Only the Director Defendants can duly exercise these responsibilities.

74.    Consequently, in light of the foregoing duties, responsibilities and actions, the Director Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

### *Boston Scientific Committee Defendants*

75.    As set forth in the Plan's documents, the Director Defendants appointed the members of the Committee to monitor the investments in the Plan, including Company Stock. The Committee Defendants thus had the following duties:  to comply with the Policy guidelines and objectives, to select investment managers, to meet with the investment managers to review their investment results and take appropriate action if the investment managers fail to perform as expected and to monitor the legal and regulatory issues applicable to the Policy.

76.    The Committee Defendants made recommendations regarding the Plan's investment options, including the Company's Stock Fund, on behalf of the Company and the Plan.

77.    The Committee Defendants had the responsibility to provide complete and accurate information to Participants about the investment offerings in the Plan.

22

## DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

78.   ERISA is a comprehensive statute covering virtually all aspects of an employee benefit plan, including retirement savings plans, such as the Plan.  The goal of ERISA is to protect the interests of a plan's participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit Plan and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit Plan, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

79.   Under ERISA, those responsible for employee benefit plan management stand in a fiduciary relationship to a plan's participants.  Pursuant to ERISA, a "fiduciary" is defined broadly to include all persons or entities that are able to exercise discretionary authority over the management of a plan or the payment of benefits.  29 U.S.C. § 1002(21)(A).  ERISA requires strict fidelity and loyalty in the execution of a plan's management.

80.   ERISA imposes on Defendants, who are responsible for the Plan, the requirement to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."   ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

81.   ERISA also imposes on Defendants responsible for the Plan a duty of loyalty, requiring the Defendants to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . for the exclusive purpose of . . .

23

providing benefits to the participants and their beneficiaries." ERISA § 404 (a)(1)(A)(i), 29 U.S.C. § 1104(a)(l)(A)(i).

82. Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management of the Plan or disposition of Plan's assets, include but are not limited to:

a.  The duty to investigate and evaluate the merits of decisions affecting the use and disposition of Plan's assets;

b.  The duty to evaluate all investment decisions with "an eye single" to the interests of the Participants;

c.  The duty to avoid placing themselves in a position where their acts as officers, directors, or employees of the Company will prevent their functioning with the complete loyalty to Participants demanded of them as fiduciaries and, if they find themselves in such a position, to seek independent, unconflicted advice;

d.  The duty, under appropriate circumstances, to monitor or influence the management of the companies in which the Plan owns stock including, where appropriate, the obligation to bring a derivative action if the fiduciaries were or should have been aware that the officers and directors of the entities whose stock was held by the Plan had breached fiduciary duties owed their shareholders;

e.  To the extent that a party is responsible for appointing and removing fiduciaries, the duty to monitor those persons who have been named;

f.  The duty to disclose and inform of any material adverse information about

the Company which duty entails, among other things: (1) a duty not to make materially false and misleading statements or misinform the Participants; (2) an affirmative duty to inform the Participants about material adverse factors which were affecting the Company any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; (3) a duty to convey complete and accurate information material to the circumstances of the Participants and their beneficiaries; (4) a duty to insure that investments were not purchased at a price above what the Defendants, but not the participants and beneficiaries, knew or should have known to be in excess of fair market value as defined in the relevant Treasury regulations and in most instances at a price which renders it improbable that the investments will bring a fair return commensurate with the prevailing rates; and (5) a duty to diversify the Plan's investments to minimize the risk of large loss to the Plan and the Participants;

g.   When a plan is composed of various investment funds, the duty to inform and disclose also includes the duty to impart to Participants material information which the fiduciary knows or should know is sufficient to appraise the average plan participant of the comparative risks associated with investing in any particular investment; and

h.   The duty to diversify and/or cause the Plan's investments to be diversified in order to minimize the risk of large losses.

83.   ERISA permits the fiduciary function to be shared among various individuals and

25

entities. Given ERISA's functional conception of a fiduciary, absent formal discovery it is impossible to know which fiduciaries exercised which fiduciary functions.

84.    Insofar as the Plan was not a properly diversified fund and therefore more risky to the Participants, the Defendants had heightened fiduciary duties to the Participants with respect to the Plan's investment in Boston Scientific Stock, including heightened duties to disclose all material information relevant to investments in Boston Scientific Stock.

## FACTS BEARING ON DEFENDANTS' FIDUCIARY BREACHES

85.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. The Defendants breached their duties to prudently and loyally manage the Plan's assets because during the Class Period, Defendants knew or should have known that Company Stock was not a prudent investment for the Plan. The Defendants knew or should have known that the value of Company Stock was artificially inflated during the Class Period, creating an unacceptable risk of loss. Defendants failed to take adequate steps to prevent the Plan, and indirectly the Participants, from suffering losses as a result of the Plan's investment in Company Stock. Throughout the Class Period, Defendants continued to accept the Company matching contributions in Company Stock, instead of in a prudent retirement investment.

86.    During the Class Period, the Plan was heavily loaded with Company Stock. One hundred percent of Boston Scientific's matching contributions was made in the form of Boston Scientific Stock, and Boston Scientific Stock amounted to 41% of the Plan's assets at year-end 2003, 34% of the Plan's assets at year-end 2004 and 19.5% of the Plan's assets at year-end 2005. This investment strategy proved to be disastrous. When information emerged publicly in 2004 through 2006 concerning safety concerns associated with Boston Scientific's stent products, the details of the contentious relationship with Medinol, Ltd., the details of a Department of Justice

26

investigation into the Company's 1998 recall of stents and the widespread problems in its manufacturing facilities, Boston Scientific Stock fell by approximately fifty percent, causing millions of dollars in losses to the Plan.

**A.    The Department of Justice Investigation**

87.    In 1998, Boston Scientific was a medium-sized medical device company looking to grow its business in the burgeoning coronary stent market. Stents are small, wire-mesh sheaths that hold open arteries after they have been cleared of blockages. In a standard stenting procedure, a cardiologist working through an opening in the patient's groin maneuvers a stent into position inside tiny coronary arteries that feed blood to the heart muscle. The doctor inflates a balloon within the stent by filling it with high-pressure bursts of saline solution. That expands the stent to full size, moving the blockages aside and keeping the artery propped open. Once the stent was deployed, the doctor would deflate the balloon and withdraw the catheter leaving the stent in the artery, all to provide arterial support and prevent reclosure of the artery.

88.    On August 11, 1998, Boston Scientific received its highly anticipated approval from the Food and Drug Administration ("FDA") for its NIR™ ON™ Ranger™ with SOX stent delivery system. Boston Scientific started shipping the stent system immediately. Within days, the Company received 17 reports from doctors and hospitals that the balloons in the delivery system that were used to deploy the stents were prematurely failing by leaking or bursting at pressures below the maximum pressures stated on the device labels.

89.    The reports of failures continued to come in. In some cases, the balloon problems resulted in critical medical emergencies, according to "adverse event" reports filed by doctors and hospitals with the FDA. Sometimes, pinhole leaks in the balloon allowed the inflating solution to spray into the wall of patients' arteries, causing scratches or tears.

90.    "While an NIR stent was being deployed in a right coronary artery, it became

27

evident that there was a pinhole leak in the delivery balloon," creating a "large, deep" tear extending several inches, according to an FDA report from September 11, 1998. Doctors treated the tear with additional stents. In doing so, one branch of the coronary arteries was blocked. The patient suffered a heart attack but survived.

91.    A September 16, 1998, report described how a balloon rupture created a tear that doctors repaired with six additional stents. Eleven days later, after reporting chest pain, the patient was returned to the cardiac catheterization lab, where an angiogram indicated a serious blood clot. The patient, who was not taking an anticoagulant because of drug interactions with cancer treatments, died.

92.    On August 28, 1998, as reports of failures continued to come in, engineers at Boston Scientific conducted an internal investigation to determine the extent of any problem or defect in the devices that were in the Company's finished goods inventory and awaiting shipment. The tests revealed that 10 of 90 devices (21.1%) tested of the most popular sized device had balloons that were failing prematurely. As a result of this high failure rate, the engineers immediately shut down manufacturing of that sized device and forwarded the results to corporate management. Two days later, additional testing was complete and results showed that the balloons were failing prematurely at rates between 2.9% and 12.6% depending upon the size of the device. As a result, the engineers shut down manufacturing of the entire NIR™ ON™ Ranger™ and SOX product line and relayed the results to corporate management.

93.    On September 2, 1998, Boston Scientific convened an internal Field Action Committee to review the premature balloon failures and determine whether the Company should continue to ship the device. The Field Action Committee concluded that commercial distribution should continue.

28

94.    Boston Scientific continued to investigate the device's problems but was unable to determine the root cause, unable to develop a screening test to be used in the manufacturing process and unable to develop a screening mechanism to segregate the defective devices in its inventory awaiting commercial distribution. However, Boston Scientific continued to ship the devices.

95.    On September 16, 1998, former chairman and CEO Nicholas decided that the Company should recall the devices. The next day, Nicholas consulted with principals of Medinol Ltd., a key supplier of a component of the device, and Company counsel. Nicholas' position was that the manufacturing process failed to produce a product which met the FDA's approved specifications and therefore, a recall was proper. Nicholas stated at the time that "we still find ourselves in a situation where we're in violation of the Code and we're in fact shipping adulterated product and we cannot do that."

96.    Larry R. Pilot ("Pilot") of the law firm of McKenna Long & Aldridge LLP advised Boston Scientific on how to deal with the FDA. McKenna advised the Company to pull the stents off the market. FDA approval of a medical device like a stent includes inspection and certification of the entire manufacturing process. But Boston Scientific had made a change to the way it secured the balloon to the stent. Now there was concern that the change had contributed to the balloon failures. Pilot stated, "There is no doubt in my mind that when the agency learns about what we know namely that by our change in manufacturing process, we introduced a defect into the product that they will expect" a recall. "I don't know how the agency could rationalize accepting our continued distribution of a product for which the defect rate might be 10 percent."

97.    Nevertheless, Medinol's principals argued against a recall on the basis that a

recall would take the stent off the market for at least half a year. Ultimately, the Company decided it would not recall the defective stents, and would not withdraw them, an intermediate step in which shipments are halted but stents already in hospitals could continue to be used. Instead, Boston Scientific would "engage" with the FDA and seek guidance on how to deal with the leaks. The Company hoped such a strategy would minimize the time the product—a distinct improvement over existing stents—was kept from doctors and patients.

98.    Boston Scientific's first step was to send what is known among physicians and regulators as a "Dear Doctor" letter. In the letters, sent September 17 and 18 to 2,000 doctors at 213 hospitals across the nation, a marketing executive said doctors could "minimize the occurrence and severity of balloon failures" by closely following the NIR stent's instructions for use. However, Boston Scientific was already aware that the failure in the balloons was occurring even with physicians who were using the device indicated. Moreover, the letter to doctors did not mention the high rate of balloon failures the Company found in its internal testing or that the Company had stopped manufacturing the stents as it sought to find the cause of the failures.

99.    The following day, Pilot called Dr. Susan Alpert, director of the FDA's Office of Device Evaluation, which had approved the NIR stent. According to a list of talking points prepared for the call, he planned to tell her that the company needed "agency guidance." He would point out that doctors liked the new stents and that a competitor's stents had a higher rate of complications after its introduction about a year earlier. Later that day, Boston Scientific shipped NIR stents worth $2.66 million.

100.    Moreover, during the call between the FDA and Boston Scientific, the FDA expressed serious concerns about the Company's continued shipments of the stent systems.

101.   On September 30, Boston Scientific sent a stent safety report to the FDA. It concluded, "The product failure rate does not represent an unreasonable risk to patient health and is within the range of rates estimated for currently available products." But a chart showed the stents had far more complaints and injuries than another Boston Scientific stent, highlighting the impact of the pinhole leaks.

102.   However, Boston Scientific continued to ship an average of $1.5 million worth of stents each day.

103.   On October 5, 1998, Company officials finally met face-to-face with the FDA. A formal recall was finalized. Nonetheless, Boston Scientific shipped another $2 million of NIR stents later that day after it told the FDA it would initiate the recall.

104.   On June 24, 2005, the U.S. Attorney's Office announced that a civil complaint was filed in federal district court charging Boston Scientific with distributing in interstate commerce 34,589 medical devices that were adulterated and misbranded between August 12, 1998 through October 5, 1998.

105.   The Department of Justice issued the following statement at the time of the announcement:

> This case represents a failure by Boston Scientific to take the most appropriate steps in a timely manner to ensure that the devices it was distributing to hospitals nationwide performed properly, said U.S. Attorney Michael J. Sullivan. The company identified the problem through its own internal testing and took a risk that those same problems would not occur in the marketplace. This type of behavior by a major medical device manufacturer is unacceptable.

106.   The complaint was filed after a six year investigation by the Department of Justice before the sealed chambers of a federal grand jury. In the years preceding the settlement, the Company made vague reports of the Department of Justice inquiry and merely stated that the Company acted in a responsible and appropriate manner with regard to the October 1998 recall.

31

Boston Scientific never disclosed the severity of the inquiry such that it would give the Participants actual knowledge that the Plan's fiduciaries breached their ERISA mandated duties. Very little was known about the six-year criminal investigation until the Honorable William G. Young of the United States District Court, District of Massachusetts issued a ruling on March 16, 2004. To avoid compromising the government's investigation and to maintain the secrecy of the proceedings, Judge Young disguised the names of the parties (Boston Scientific is called XYZ Corp. Company officials are referred to by their titles and the stents are called "widgets.")

107.    At the same time as the announcement of the filing of the civil complaint, Boston Scientific agreed to pay $74 million to the government to resolve the charges.

## B.    The Medinol Relationship

108.    In 1995, Medinol Ltd., an Israeli medical device company, entered into an agreement with Boston Scientific to manufacture and supply its NIR stents for use with Boston Scientific's balloon catheter system. Under the agreement, Medinol was to become Boston Scientific's primary source of stents for at least ten years. The only exception was a backup manufacturing line that was to be installed by Medinol engineers at a Boston Scientific facility and kept dormant unless Medinol couldn't keep up with Boston Scientific's demand for stents. Medinol was to supply to Boston Scientific one of its unique machines that made stents by folding flat wire-mesh panels into cylindrical tubes and welding the edges together. The machine was to be part of the backup manufacturing line run by Boston Scientific in case terrorism or some other catastrophe prevented Medinol from supplying stents to Boston Scientific. In addition, as part of the agreement, Boston Scientific purchased a 22% stake in Medinol.

109.    However, soon after the agreement with Medinol was signed, Boston Scientific wanted to end the supply agreement prematurely and make its own stents after it learned that

32

Medinol was earning profit margins of up to 90 percent on the stents. Defendant Best said in an interview with an Israeli newspaper in October 2001 that he knew he had made a mistake when the Medinol agreement was signed: "The relationship with Medinol is like cancer. It's a terrible thing, you don't know how you got it, but you know you have to get rid of it."

110.    In April 1997, Boston Scientific launched "Project Independence." Project Independence involved a scheme in which Boston Scientific would build its own stent machine similar to Medinol's stent machine. To achieve its plan, Boston Scientific incorporated an Irish firm called Forwich and hired an outside consultant to run the newly formed company "to shield Boston Scientific from being associated with the project activities." Forwich set up a bank account, registered with tax authorities, and leased a "ghost office." Forwich conducted business under the name BBD, which was an acronym for "Bringing a Better Deal" to Boston Scientific.

111.    In June 1997, Paul Redmond, director of engineering and research and development at Boston Scientific Ireland, told Aiden Flanagan, an engineer who worked on much of the secret operation, that the purpose of the exercise was "to copy the machine."

112.    Boston Scientific Ireland ordered the machine from Medinol on July 1, 1997. It was shipped on July 20 and arrived in Ireland on July 25. When the machine arrived at Boston Scientific's Ballybrit Business Park facility in Ireland, it wasn't even unpacked from its crate. Instead, it was immediately reloaded onto another truck and shipped 135 miles to the Sandyford Industrial Estate in Dublin, Ireland.

113.    In Dublin, BBD engaged two engineering companies to dismantle and reverse-engineer the Medinol machine. They also sought suppliers for raw materials for the stents. To mask its illicit stent making activities, BBD told suppliers it was making "heat exchangers."

114.    In addition to making an unauthorized copy of the Medinol machine, BBD sought

to duplicate Medinol's stents so it could test whether the copy could actually manufacture stents. Eric Stenzel, the lead engineer on the project, has stated that he copied diagrams of two types of Medinol stents, the NIR and NIR Conformer, but altered three pieces of information in his drawings. He changed the name of the device from "stent" to "heat exchanger,"; the company name from Medinol to BBD, and change "Medinol Confidential" to "BBD Confidential."

115.    In August 1997, BBD shipped the original Medinol machine to a Galway, Ireland suburb where Boston Scientific maintained a facility. The following year, Boston Scientific shut down the secret Dublin office but continued to develop the replicated machine in Galway. BBD kept its replicated machine in a locked room in the back of a warehouse. The only person with a key to the room was Stenzel.

116.    Project Independence was a secret within Boston Scientific, however several senior officers were aware of it. Defendants Best and Nicholas both signed capital expenditure forms totaling over $960,000 in September 1997 to purchase a variety of welding equipment and other support for the project.

117.    Between 1997 and 2000, the secret stent operation took another turn. As claimed by Medinol, Boston Scientific had used the NIRflex stents created by the duplicate machine to develop Boston Scientific's Express cardiac stents and its Taxus drug-coated stent system.

118.    In the unrelated investigation by the U.S. Department of Justice regarding the 1998 recall of the NIR stent system, investigators stumbled upon the BBD operation. As a result, in April 2000, Defendant Tobin met with officials at Medinol and divulged the details of Project Independence. At a deposition, Tobin stated with regard to the disclosure to Medinol: "I do not believe that there is any other CEO in corporate America who has to make a disclosure like this. [Project Independence] was a stupid thing."

119.    In April 2001, Medinol filed suit against Boston Scientific seeking billions of dollars in damages for breach of contract and theft of trade secrets. After a three year legal battle, in September 2005, Boston Scientific agreed to pay Medinol $750 million to settle Medinol's claims in connection with the 1995 agreement. The settlement amount was the largest sum Boston Scientific ever paid in a legal dispute with another company. As part of the settlement, Boston Scientific also agreed to give up its equity stake in Medinol. However, Medinol retained the right to pursue certain claims in arbitration proceedings against Boston Scientific for patent infringement in connection with Boston Scientific's Liberte products.

## C.    Boston Scientific's Recall of Defective Stents

120.    Boston Scientific's leading stent is the TAXUS Express2 paclitaxel-eluting stent system, which is coated with time-release medicine that prevents the formation of scar tissue, which had long been a problem with older stents. The stent system includes a catheter used to insert the stent that uses a tiny balloon to press the stent into place. The TAXUS stent system is manufactured at Boston Scientific's Maple Grove, Minnesota and Galway, Ireland plants.

121.    TAXUS was introduced in Europe in February 2003 and established itself as a market leader. TAXUS's U.S. launch was eagerly anticipated and was widely expected to double the Company's sales by 2006. FDA approval was granted on March 4, 2004, and, with much fanfare, the stents were launched immediately.

122.    Defendant Tobin commented as follows on the launch, highlighting the purported safety of the products:

> This approval is a breakthrough event for the treatment of cardiovascular disease in the United States," said Jim Tobin, President and Chief Executive Officer of Boston Scientific. "Broad, consistent clinical data and extensive real-world experience have clearly demonstrated that polymer-based delivery of paclitaxel is a safe and effective therapy that dramatically reduces restenosis. These attributes are complemented by the

35