UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


ROBERT HOCHSTADT and EDWARD HAZELRIG,  )
JR., on behalf of themselves,          )
the Boston Scientific Corp. 401(k)    )
Retirement Savings Plan, and          )
all other similarly situated,         )
                                )   CIVIL ACTION NO.
    Plaintiffs,                )   08-12139-DPW
                                )
v.                             )
                                )
BOSTON SCIENTIFIC CORP. *et al.*      )
                                )
    Defendants.                )


MEMORANDUM AND ORDER
April 27, 2010


Before me is a motion seeking preliminary review[1] of a

settlement agreement resolving two putative class actions[2]

_____

[1]  By terms, the motion seeks "preliminary approval" of the settlement agreement.  As will be discussed below, the approval of a settlement agreement is a two-step process, which first requires the court to make a preliminary determination regarding the fairness, reasonableness, and adequacy of the settlement terms.  MANUAL FOR COMPLEX LITIGATION (FOURTH) § 13.14 (2004).  It is only after the second step, a fairness hearing has taken place, however, that the court may "approve" the settlement agreement.  *Id.*; *see generally* PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.03, cmt. a (Proposed Final Draft, Apr. 1, 2009, approved in substance at the American Law Institute's 2009 Annual Meeting) (discussing preliminary review process).  Accordingly, I have replaced the term "approval" with the term "review" for this step in the process.

[2]  The settlement agreement before me would effectively resolve two parallel class actions based on the same allegations: (A) *Hochstadt et al. v. Boston Scientific Corp. et al.*, Civil Action No. 08-cv-12139-DPW (D. Mass.) ("*ERISA II*"), in which Plaintiff Hazelrig is a representative party and (B) *In re Boston Scientific Corp. ERISA Litig.*, Civil Action No. 06-cv-10105-JLT (D. Mass.) ("*ERISA I*") (appeal currently pending, *In re Boston Scientific Corp. ERISA Litig.* (1st Cir. No. 08-2568)), in which

against Boston Scientific Corporation ("Boston Scientific" or the "Company") and alleged fiduciaries[3] of Boston Scientific Corporation's 401(k) Retirement Savings Plan (the "Plan") (collectively, the "Defendants").  Both class actions are based on the allegation that Defendants breached their fiduciary duty to the Plan and to the Plan's participants, in violation of the Employee Retirement Income Security Act ("ERISA"), by imprudently selecting Boston Scientific stock as an investment, despite their knowledge that the stock price was artificially inflated.  The proposed settlement class consists of participants in the Plan whose individual Plan accounts held an interest in Boston Scientific common stock at any time between May 7, 2004 and January 26, 2006 (the "Class Period").  For the reasons set forth more fully below, I will certify the settlement class and authorize the publication of the proposed class notice.

---

the named representative parties - who were found not to have standing in *ERISA I*, as a consequence of which they have no standing in *ERISA II* under principles of res judicata - are purporting to prosecute on behalf of other *ERISA II* class members.  As noted at Note 7 *infra*, the named representative parties in *ERISA I* have entered into a separate individual settlement as to their claims.

[3]   The individual defendants include James R. Tobin, Peter M. Nicholas, John E. Abele, Joel L. Fleishman, Ernest Mario, Ph.D., Uwe E. Reinhardt, John E. Pepper, Ursula M. Burns, Marye Anne Fox, Ph.D., Ray J. Groves, N.J. Nicholas, Jr., Senator Warren B. Rudman, Lawrence C. Best, Robert G. MacLean, Lucia L. Quinn, Paul W. Sandman, Richard A. Duffy, Warren Clark III, Rose Marie Brana Haslinger, Jamie Rubin, John and Jane Does 1-10.

## I. BACKGROUND

### A. *Facts*

Boston Scientific develops, manufactures, and distributes medical devices whose products are used in the cardiovascular and endosurgery health care arena. During the Class Period, Boston Scientific administered the Plan in the interest of its participants.

The Plan qualifies as an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Participants in the Plan make voluntary contributions and the Company makes matching contributions. Throughout the Class Period, participants could contribute to the Plan between 1% and 25% of their pre-tax annual compensation and between 1% and 10% of their compensation on an after-tax basis each year. Effective January 1, 2005, the Company provided a matching contribution equal to 200% of the employee's contribution for up to 2% of the employee's earnings, plus 50% of the next 4% of the employee's earnings. During the Class Period, the Plan offered approximately ten separate investment options, including Boston Scientific stock.

Plaintiffs[4] allege that Defendants issued several misleading

---

[4] The term "Plaintiffs" refers in this section to the Plaintiffs both in *ERISA I* and in *ERISA II*, *see* Note 2 *supra*, because the complaints in both actions are based on identical underlying allegations.

public disclosures, which caused the Company stock to be inflated artificially during the Class Period (the "Inflation Claim"). Plaintiffs further contend that, despite their knowledge that Boston Scientific stock was not a prudent investment for the Plan, Defendants continued to accept the Company matching contributions in Boston Scientific stock throughout the Class Period, thereby causing losses to the Plan's participants (the "Prudence Claim").

The alleged misleading disclosures are based on four events.[5]  First, Plaintiffs contend that Defendants failed to

---

[5]  Parallel to this litigation, several related securities fraud cases filed in 2005 against Boston Scientific were consolidated into a single case before Judge Tauro on February 15, 2006.  *In re Boston Scientific Corp. Sec. Litig.*, Civil Action No. 05-11934.  Lead Plaintiff Mississippi Public Employees' Retirement System, a pension fund, subsequently filed a Consolidated Amended Complaint, alleging false and misleading statements in connection with the same four events at issue in the present case: (1) the Department of Justice investigation into a 1998 product recall, (2) the civil lawsuit with Medinol Ltd., (3) the introduction and subsequent recall of the TAXUS stents, and (4) investigations and warnings by the US Food and Drug Administration regarding Boston Scientific's manufacturing facilities.  Judge Tauro dismissed the action on June 21, 2007. *In re Boston Scientific Corp. Sec. Litig.*, 490 F. Supp. 2d 142 (D. Mass. 2007).  Lead Plaintiff filed an appeal limited to the TAXUS stent claims, and the First Circuit reversed dismissal with regard to those claims and remanded the case on April 16, 2008. *Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75 (1st Cir. 2008).  The securities fraud litigation was transferred to me on remand.  Thereafter, Lead Plaintiff filed a Second Consolidated Amended Complaint and a motion for class certification, which I granted on March 10, 2009.  *In re Boston Scientific Corp. Sec. Litig.*, 604 F. Supp. 2d 275 (D. Mass. 2009).  I have this day, however, granted summary judgment for the Defendants as to the remaining TAXUS claims.  *In re Boston Scientific Corp. Sec. Litig.*, No. 05-11934-DPW (D. Mass. filed Apr. 27, 2010).

disclose adequately the 1998 investigation conducted by the Department of Justice ("DOJ") concerning defective NIR stents. This investigation led the DOJ to file a civil complaint in 2005 charging Boston Scientific with distributing in interstate commerce medical devices that were altered and misbranded between 1998 and 2005 and resulted in the payment by Boston Scientific of $74 million.

Second, Plaintiffs allege that Defendants misrepresented the seriousness of the litigation with Medinol Ltd., one of Boston Scientific's suppliers, as to which Defendants agreed to pay a $750 million settlement in 2005.

Third, Plaintiffs contend that Defendants failed to disclose adequately concerns associated with the 2004 recall of TAXUS stent systems when Defendants knew or should have known before the recalls took place that the TAXUS product contained dangerous manufacturing defects, which would lead to massive liabilities adversely affecting the Company stock.

The last subject as to which Defendants allegedly made misrepresentations concerns a series of "warning letters" sent between 2005 and 2006 by the US Food and Drug Administration ("FDA") to Boston Scientific in connection with FDA violations by several of its manufacturing facilities.

## B.  *Procedural History*

In January 2006, Plaintiffs Douglas Fletcher, Michael Lowe,

Jeffrey Klunke, and Robert Hochstadt each filed separate class action complaints against Defendants.  The four complaints were consolidated before Judge Tauro on April 3, 2006; a consolidated complaint was subsequently filed by Plaintiffs.  *In re Boston Scientific Corp. ERISA Litig.*, Civil Action No. 06-cv-10105-JLT (D. Mass.) ("*ERISA I*").

On October 10, 2006, Defendants filed a motion to dismiss the Consolidated Complaint.  Judge Tauro denied Defendants' motion in significant part on August 27, 2007.[6]  *In re Boston Scientific Corp. ERISA Litig.*, 506 F. Supp. 2d 73 (D. Mass. 2007).  Thereafter, the parties commenced fact discovery.

On March 12, 2008, Plaintiffs Fletcher, Lowe, Klunke and Hochstadt moved to certify the class under Federal Rule of Civil Procedure 23(a) and (b)(1).  Klunke and Hochstadt later withdrew from the litigation.  However, on June 30, 2008, Hochstadt filed a motion to intervene and asked to be reappointed as a class representative.  On November 3, 2008, Judge Tauro denied the motion for class certification and Hochstadt's motion to intervene; he then dismissed the case because Plaintiffs Fletcher and Lowe lacked Article III standing.  *In re Boston Scientific Corp. ERISA Litig.*, 254 F.R.D. 24 (D. Mass. 2008).  On December 2, 2008, Plaintiffs Fletcher, Lowe, and Hochstadt filed a notice

---

[6]  Plaintiffs' ERISA § 502(a)(3) claims were dismissed, however.  *In re Boston Scientific Corp. ERISA Litig.*, 506 F. Supp. 2d 73, 76 (D. Mass. 2007).

of appeal.  *In re Boston Scientific Corp. ERISA Litig.* (1st Cir.
No. 08-2568).  The matter is currently stayed in the First
Circuit, pending settlement developments.

On December 24, 2008, Plaintiffs Hochstadt and Hazelrig
filed the instant action, *Hochstadt et al. v. Boston Scientific
Corp. et al.,* Civil Action 08-cv-12139-DPW (D. Mass.) ("*ERISA
II*"), seeking to sidestep the standing issue and the problem of
Hochstadt's failure to reenter the case through intervention,
which together ended *ERISA I* before Judge Tauro.  Thereafter, the
parties resumed fact discovery where they left off in *ERISA I*.
In doing so, the parties agreed that all documents produced in
*ERISA I* would be deemed produced in *ERISA II*.

Under the auspices of Settlement Counsel for the First
Circuit, counsel for Plaintiffs Fletcher, Lowe, and Hazelrig and
the Defendants in September 2009 agreed to settle *ERISA I* and
*ERISA II* (collectively, the "ERISA Actions") for an amount of
$8.2 million (the "Settlement Amount") to be paid in cash by
Boston Scientific and its insurer, St. Paul Mercury Insurance
Company.

On December 1, 2009, Plaintiffs Fletcher, Lowe, and Hazelrig
filed a motion for preliminary review, *see* Note 1 *supra*, of the
Proposed Settlement Agreement, contending that the agreement was
an excellent result for the Settlement Class on whose behalf the
ERISA Actions were brought.  In their motion, they also sought

certification of a mandatory class under Rule 23(b)(1) on the basis that the ERISA Actions involved Defendants' Plan-wide conduct and relief was sought on behalf of the Plan as a whole.

Plaintiff Hochstadt filed an opposition to this motion by Plaintiffs Fletcher, Lowe, and Hazelrig, alleging that Fletcher and Lowe had been found to lack standing to settle the ERISA Actions, that the settlement amount was insufficient and that the non-opt-out provision, the proposed plan of allocation and the class notice were inappropriate.

I held a hearing on January 13, 2010 in connection with my preliminary review of the Proposed Settlement Agreement.  During that hearing, I requested the parties to file supplemental briefing on three points: (1) the participation of Plaintiffs Fletcher and Lowe in the class settlement in light of Judge Tauro's decision that they lacked Article III standing, (2) the proposed plan of allocation, which at the time did not separately take into consideration discrete disclosure events that occurred during the Class Period, and (3) the publication of the report of the independent fiduciary Plaintiff Hazelrig and Defendants agreed to retain to review the settlement agreement.

On February 17, 2010, Plaintiff Hazelrig and Defendants submitted the Amended Stipulation and Agreement of Settlement (the "Amended Settlement Agreement") now before me.  Pursuant to this amended agreement, Plaintiffs Fletcher and Lowe are now

-8-

excluded from the Settlement Class, leaving Hazelrig the only
settlement class representative.[7]  The Amended Settlement
Agreement incorporates a revised plan of allocation (the "Revised
Plan of Allocation"), a copy of which is attached hereto as
Exhibit A, which now provides for the payment of settlement
proceeds to class members separately based upon discrete
disclosure events that occurred during the Class Period.  A
revised class notice has been prepared reflecting the Revised
Plan of Allocation (the "Revised Class Notice").  In addition,
Plaintiff Hazelrig and the Defendants have committed to ensure
that the report of the independent fiduciary they will retain
will be made publicly available at least thirty days before the
deadline for objecting to the Amended Settlement Agreement.

---

[7]  Fletcher and Lowe are entering into a separate settlement
agreement with the Defendants to resolve their individual claims,
including dismissal of the currently-pending appeal of *ERISA I*.
Plaintiff Hazelrig and Defendants report in their briefing that
the additional payment Defendants are making in connection with
the separate Fletcher/Lowe settlement will not affect the amount
being paid under the proposed class settlement.  I have reviewed
the Fletcher/Lowe settlement agreement and find that their
settlement does not derogate from or otherwise adversely affect
the proposed Class Settlement before me.  I have directed the
settling parties to file the Fletcher/Lowe Settlement Agreement,
with the amount of financial consideration redacted, because my
review of that Agreement as a whole - but not the amount of
financial consideration - has played a role in my preliminary
review of the Class Settlement.  The redacted Fletcher/Lowe
Settlement Agreement is docketed as No. 71.  As to Hochstadt's
separate appeal, it will presumably be mooted if the non-opt-out
Class Settlement before me is ultimately approved.

## II.  PRELIMINARY CLASS CERTIFICATION

Before preliminarily determining whether the settlement is fair, I must determine whether to certify the class for settlement purposes.  The Amended Settlement Agreement defines the Settlement Class as a non-opt-out class consisting of:

> [A]ll Participants in the Plan for whose individual accounts the Plan held an interest in Boston Scientific common stock at any time during the Class Period. Excluded from the Proposed Class are Douglas Fletcher, Michael Lowe, Defendants, members of the Defendants' Immediate Families, any officer, director or principal stockholder of Boston Scientific under Section 16 of the Securities Exchange Act of 1934, any entity in which a Defendant has a controlling interest, and their heirs, Successors-In-Interest, or assigns (in their capacities as heirs, Successors-In-Interest, or assigns).

Am. Settlement Agreement, ¶ 1.1.29.  I first address the standing issue before turning to the requirements of Federal Rule of Civil Procedure 23.

### A.  *Standing*

In a class action lawsuit, as in every law suit, "Article III standing is a 'threshold requirement,' and the representative plaintiff must demonstrate personal injury in fact to certify a class."  *In re Boston Scientific ERISA Litig.*, 254 F.R.D. at 28. As discussed above, Judge Tauro previously dismissed class certification in *ERISA I* because the proposed class representatives, Fletcher and Lowe, failed to demonstrate individual injury in fact and therefore lacked Article III standing.  *Id.* at 28-32.

-10-

Plaintiff Hochstadt initially relied on Judge Tauro's ruling to show that Plaintiffs Fletcher and Lowe lacked standing to settle the ERISA Actions.  Given that Plaintiffs Fletcher and Lowe are now excluded from the Settlement Class, *see* Notes 2 and 7 *supra,* the only issue at this point is therefore whether Plaintiff Hazelrig has adequate standing to settle the ERISA Actions as class representative.

Hochstadt did not specifically address Hazelrig's standing in his initial briefing.  Rather he merely contended, without adducing any evidence, that "the presently 'proposed' representatives are not representative because they did not lose money[,] were not injured."  For his part, Hazelrig asserted without evidentiary support, that he has constitutional and statutory standing to maintain and settle the ERISA Actions because he has suffered a compensable loss.  At a further hearing in this matter on April 21, 2010, I directed counsel for Hazelrig to make a submission demonstrating that Hazelrig in fact has a compensable loss, which would support his standing to act as class representative.  Counsel has submitted a Declaration from Candace L. Preston, CFA, who assisted crafting the Revised Plan of Allocation.  Ms. Preston opined that Hazelrig would have a likely recovery of approximately $1,970.00.  This is sufficient

to establish standing at this stage.[8]  For purposes of this
preliminary review, I find that Plaintiff Hazelrig has the
requisite standing to settle the ERISA Actions and will therefore
focus my analysis on whether the Rule 23 requirements are met in
this case.

**B.**   ***Rule 23***

    1.   Legal Standard

    In order to certify a class, "[a] district court must
conduct a rigorous analysis of the prerequisites established by
Rule 23." *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38
(1st Cir. 2003) (citing *Gen. Tel. Co. v. Falcon,* 457 U.S. 147,
161 (1982)).  In doing so, "the question is not whether the
plaintiff or plaintiffs have stated a cause of action or will
prevail on the merits, but rather whether the requirements of
Rule 23 are met." *Waste Mgt. Holdings, Inc. v. Mowbray*, 208 F.3d
288, 298 (1st Cir. 2000) (quoting *Eisen v. Carlisle & Jacquelin*,
417 U.S. 156, 178 (1974)).  "[W]hen confronted with a request for
settlement-only class certification, a district court need not
inquire whether the case, if tried, would present intractable
management problems, for the proposal is that there be no trial."

_____

    [8] Hochstadt has challenged the Preston Declaration as
inadequate because "rather than providing the underlying factual
information, the Declaration presents [only] Preston's ultimate
conclusion that Hazelrig has a recognized claim."  While I do not
find Hazelrig's objection compelling at this stage, I will permit
him to engage in limited discovery regarding the issue, should he
seek to do so.

*Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).  Nevertheless, "[w]hen a settlement class is proposed, it is incumbent on the district court to give heightened scrutiny to the requirements of Rule 23 in order to protect absent class members."  *In re Lupron Mktg. and Sales Practices Litig.,* 228 F.R.D. 75, 88 (D. Mass. 2005) (citing *Amchem*, 521 U.S. at 620). "This cautionary approach notwithstanding, the law favors class action settlements."  *Id.* (citing *City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996)).

To obtain class certification, the plaintiff must establish the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation and demonstrate that the action may be maintained under Rule 23(b)(1), (2), or (3). *See Smilow,* 323 F.3d at 38 (citing *Amchem*, 521 U.S. at 614). Here, Hazelrig seeks to obtain class certification pursuant to Rule 23(b)(1).

## 2.   Rule 23(a)

In light of the First Circuit's instruction in *Smilow* that the court to which a settlement is tendered conduct a "rigorous analysis of the prerequisites established by Rule 23," I address each of Rule 23 requirements, although only the typicality and the adequacy requirements appear to be in dispute.

### a.   Numerosity

In order to satisfy Rule 23(a)(1)'s numerosity

requirement, Plaintiff must demonstrate that "the class [would be] so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1).  This requirement is easily met here because the Settlement Class consists of approximately 12,000 Boston Scientific employees who held Boston Scientific stock in their Plan accounts during the Class Period.

     *b.  Commonality*

Rule (23)(a)(2)'s commonality requirement is satisfied when "there are questions of law or fact common to the class."  FED. R. CIV. P. 23(a)(2).  "While at least one common issue of fact or law at the core of the action must shape the class, Rule 23(a) does not require that every class member share every factual and legal predicate of the action."  *In re Lupron,* 228 F.R.D. at 88. "The threshold of commonality is not a difficult one to meet." *In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 69 (D. Mass. 2005).

In this case, there are a number of common issues of fact and law that the Settlement Class members bear upon in establishing the Defendants' liability, as well as Plaintiffs' entitlement to damages.  Such questions concern Defendants' alleged breaches of fiduciary duties under ERISA and their impact on the price of Boston Scientific stock.  Accordingly, I conclude that the commonality requirement of Rule 23(a)(2) is satisfied.

c.   *Typicality*

The typicality requirement set forth in Rule 23(a)(3)
requires that "the claims or defenses of the representative
parties are typical of the claims or defenses of the class."
FED. R. CIV. P. 23(a)(3).  "The representative plaintiff satisfies
the typicality requirement when its injuries arise from the same
events or course of conduct as do the injuries of the class and
when plaintiff's claims and those of the class are based on the
same legal theory."  *In re Credit Suisse-AOL Sec. Litig.*, 253
F.R.D. 17, 23 (D. Mass. 2008).  The typicality inquiry "is
designed to align the interests of the class and the class
representatives so that the latter will work to benefit the
entire class through the pursuit of their own goals."  *In re
Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283,
311 (3d Cir. 1998).  "Rule 23(a)(3), however, does not require
that the representative plaintiff's claims be identical to those
of absent class members."  *In re Credit Suisse*, 253 F.R.D. at 23.

Here, Plaintiff Hazelrig was a Boston Scientific employee
and his claim arises from the fact he held Boston Scientific
stock in its Plan account during the Class Period.  Contrary to
Hochstadt's allegations, Hazelrig's claim is therefore based on
the same basic legal theory as the claims of all other class
members.  This fact is sufficient to support a finding of
typicality because I need not determine that Plaintiff Hazelrig's

-15-

claims and the claims of the Settlement Class are precisely
aligned as to all issues in order to find that Hazelrig has
satisfied his burden with respect to the typicality requirement.
*See In re Tyco Int'l, Ltd. Multidistrict Litig.*, No.
MD-02-1335-PB, 2006 WL 2349338, at *6 (D. N.H. Aug. 15, 2006).
Under these circumstances, for purposes of settlement only, I
conclude that the claims asserted by Plaintiff Hazelrig are
sufficiently typical of the claims of the Settlement Class as a
whole to satisfy Rule 23(a)(3).

>    d.   *Adequacy*

The final requirement articulated in Rule 23(a)(4) requires
that the proposed class representatives "fairly and adequately
protect the interests of the class." FED. R. CIV. P. 23(a)(4).
This entails a two-prong showing: "The moving party must show
first that the interests of the representative party will not
conflict with the interests of any of the class members, and
second, that counsel chosen by the representative party is
qualified, experienced and able to vigorously conduct the
proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d
124, 130 (1st Cir. 1985).

The first prong of the test seeks to ensure that the
interests of the class representatives are aligned with the
interests of absent class members.  For essentially the same
reasons that Plaintiff Hazelrig's claims are "typical" of the

-16-

claims of the Settlement Class, I find that, for purposes of the

settlement,[9] Plaintiff Hazelrig's interests do not conflict with

the interests of other class members. *Cf. In re Credit Suisse*,

253 F.R.D. at 22 (noting that "[t]he requirements of typicality

and adequacy tend to merge"). I also find that, unlike

Hochstadt's new counsel,[10] Plaintiff Hazelrig's counsel have

---

[9] When initially opposing class certification, Defendants
argued that Plaintiffs could not satisfy the adequacy requirement
because inherent conflicts existed between the interests of the
class representatives and the interests of other class members.
Specifically, Defendants contended that class members had
different and conflicting interests as to "(i) when, why, and the
extent to which the price of Boston Scientific stock was
artificially inflated, (ii) when and why it became an imprudent
investment that should have been eliminated as a Plan investment
option, and (iii) what alternative investment should have been
offered in its place." In making this argument, Defendants
relied on *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299 (5th
Cir. 2007), where a divided Fifth Circuit panel in a case similar
to this vacated a district court's decision to certify a class
action on the ground, among others, that "[s]ubstantial conflicts
exist[ed] among the class members, raising questions about the
adequacy of the lead Plaintiff's ability to represent the class."
*Id.* at 315. In particular, the Fifth Circuit found that
participants in the company were affected by changes in their
company's stock price in "dramatically different ways" because
some of the class members had made money while others had lost
money and because there were significant variations among class
members concerning their optimal breach dates and resulting
maximum recovery. *Id.*
    The existence of similar detailed intraclass conflicts has
not been raised or argued by Plaintiff Hochstadt. Rather
Hochstadt merely asserts "the presently 'proposed'
representatives are not [adequate] representative because they
did not lose money[,] were not injured." *See* Note 8 *supra* and
accompanying text. At this stage of the proceeding, I am
satisfied that the Revised Plan of Allocation adequately
addresses any problems of intraclass conflict.

[10] Hochstadt suggests that his new counsel, who is
apparently one of his relatives, be named interim class counsel
because Plaintiff Hazelrig's counsel is purportedly inadequate.
I find Hazelrig's counsel more than adequate to the task,

demonstrated that they are qualified, experienced, and are fully prepared to represent the Settlement Class to the best of their abilities.  Accordingly, I conclude that the adequacy requirement is satisfied in this case.

In sum, all of the Rule 23(a) requirements are met.

3.   Rule 23(b)

Plaintiff Hazelrig seeks class certification under Rule 23(b)(1)(B).[11]  In addition to satisfying the four elements set forth in Rule 23(a), Rule 23(b)(1) requires that a class action may be maintained if:

(1) prosecuting separate actions by or against individual
class members would create a risk of:  . . .

---

consequently I need not address the adequacy of Hochstadt's counsel.

[11]   While Plaintiff Hazelrig purports to seek class certification under Rule 23(b)(1)(A) and (B), I find that class certification is inappropriate under Rule 23(b)(1)(A) because Hazelrig only seeks monetary damages as opposed to equitable relief.  *See In re Tyco Int'l, Ltd.*, No. MD-02-1335-PB, 2006 WL 2349338, at *3 (D. N.H. Aug. 15, 2006) ("Certification under Rule 23(b)(1)(A) is . . . not appropriate in an action for damages.") (quoting *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1193 (9th Cir. 2001)); *Johnson v. Geico Cas. Co.,* 673 F. Supp. 2d 255, 270 (D. Del. 2009) ("Certification under Rule 23(b)(1)(A) is generally inappropriate where the primary relief sought is monetary damages."); *but see Stanford v. Foamex L.P.*, 263 F.R.D. 156, 173 (E.D. Pa. 2009) (certifying class under Rule 23(b)(1)(A) because "[t]he issue is not whether plaintiff seeks primarily monetary damages; rather, the focus of a Rule 23(b)(1)(A) analysis is on whether separate actions could lead to adjudications that establish 'incompatible standards of conduct for the party opposing the class.'") (quoting Fed. R. Civ. P. 23(b)(1)(A)).  Finding Rule 23(b)(1)(A) inappropriate to the proposed settlement, I will therefore focus my analysis on Rule 23(b)(1)(B).

> (B) adjudications with respect to individual class
> members that, as a practical matter, would be dispositive
> of the interests of the other members not parties to the
> individual adjudications or would substantially impair or
> impede their ability to protect their interests.

FED. R. CIV. P. 23(b)(1)(B).  Because Rule 23(b)(1) does not

provide opt-out protections, class actions brought under this

rule "are often referred to as 'mandatory' class actions."  *Ortiz*

*v. Fibreboard Corp.*, 527 U.S. 815, 833 n.13, 842 (1999).

Plaintiff Hazelrig argues that certification of a non-opt-out

class under Rule 23(b)(1) is appropriate in this case because the

ERISA Actions involve Defendants' Plan-wide conduct and relief is

sought on behalf of the Plan as a whole under ERISA § 502(a)(2),

29 U.S.C. 1132(a)(2).  In making this argument, Hazelrig relies

on the assumption that "[s]uits brought pursuant to this

provision are derivative in nature; those who bring suit do so on

behalf of the plan and the plan takes legal title to any

recovery."  *Evans v. Akers,* 534 F.3d 65, 70 n.4 (1st Cir. 2008)

(citing *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 141

(1985)).

Generally, an action "charging 'a breach of trust by an

indenture trustee or other fiduciary similarly affecting the

members of a large class' of beneficiaries, requiring an

accounting or similar procedure 'to restore the subject of the

trust'" is a classic example of the type of case appropriate for

certification under Rule 23(b)(1)(B).  *Ortiz*, 527 U.S. at 833-34

(quoting FED. R. CIV. P. 23 advisory committee's notes).  Not surprisingly, therefore, "[i]n light of the derivative nature of ERISA § 502(a)(2) claims, breach of fiduciary duty claims brought under § 502(a)(2) are paradigmatic examples of claims appropriate for certification as a Rule 23(b)(1) class, as numerous courts have held." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 604 (3rd Cir. 2009); *Evans v. Akers,* No. 04-11380-WGY, slip op. at 4 (D. Mass. Oct. 7, 2009) (finding class certification appropriate under Rule 23(b)(1)(B) because "[g]iven the *Plan*-representative nature of *Named Plaintiffs*' breach of fiduciary duty claims, there is a risk that failure to certify the *Settlement Class* would leave future plaintiffs without relief"); *Stanford v. Foamex L.P.*, 263 F.R.D. 156, 174 (E.D. Pa. 2009) ("because of the unique and representative nature of an ERISA § 502(a)(2) suit, numerous courts have held class certification proper pursuant to Rule 23(b)(1)(B)"); *In re Nortel Networks Corp. ERISA Litig.,* No. 03-MD-01537, 2009 WL 3294827, at *15 (M.D. Tenn. 2009) (finding class certification appropriate under Rule 23(b)(1)(B) because "[i]f individual adjudications would be dispositive of the interests of other Plan Participants, it would be better for those Plan Participants to be members of a class"); *Jones v. NovaStar Fin., Inc.*, 257 F.R.D. 181, 193 (W.D. Mo. 2009) (certifying a class under Rule 23(b)(1)(B) because "[g]iven that [named plaintiff]'s claim seeks 'Plan-wide relief, there is a

-20-

risk that failure to certify the class would leave future plaintiffs without relief'"); *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.,* MDL No. 1658, 2009 WL 331426, at *10 (D. N.J. Feb. 10, 2009) (finding class certification appropriate under Rule 23(b)(1)(B) because "[i]f the prudence claims proceeded individually, and one court removed a Plan fiduciary, this would be, as a practical matter, dispositive of the interests of the other Plan members in that particular regard"); *In re Tyco*, *Int'l, Ltd. Multidistrict Litig.,* 2006 WL 2349338, at *7 ("the majority of courts have concluded that certification under 23(b)(1)(B) is proper" for ERISA fiduciary class actions).[12]

Given that the present case involves an ERISA § 502(a)(2) claim brought on behalf of the Plan and alleging breaches of fiduciary duty on the part of Defendants that will, if true, be

---

[12]   When initially opposing class certification, Defendants argued that *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248 (2008) precluded class certification under Rule 23(b)(1)(B) because Plan participants could now pursue individual account actions against Plan fiduciaries.  Though this argument has some support, *In re First Am. Corp. ERISA Litig.*, 258 F.R.D. 610, 622 (C.D. Cal. 2009) (holding class certification inappropriate under Rule 23(b)(1)(B) because "*LaRue* cures any concern that the potential class members' claims would essentially be disposed of by this litigation"), I find it to be unpersuasive at this stage. *See Stanford*, 263 F.R.D. at 174 (discussing *LaRue*) (certifying class under Rule 23(b)(1)(B) because "[t]he availability of an individual account claim under § 502(a)(2) does not alleviate the concerns cited by the numerous courts that have certified ERISA class actions pursuant to Rule 23(b)(1)(B) in situations where claims on behalf of the Plan are identical to those on behalf of an individual account.").

the same with respect to every class member, I find that Rule
23(b)(1)(B) is clearly satisfied.  Accordingly, I conclude that
the Settlement Class should be certified.

## C.   Subclasses

Plaintiff Hochstadt argues that sub-classes should be
created to reflect the greater needs of those of are "retired and
approaching retirement."

Under Rule 23(c)(5), "[w]hen appropriate, a class may be
divided into subclasses that are each treated as a class under
this rule."  FED. R. CIV. P. 23(c)(5).  "Subclasses must be
created when differences in the positions of class members
require separate representatives and separate counsel."  MANUAL
FOR COMPLEX LITIGATION (FOURTH) § 21.23 (2004).  Subclassing may also
provide "structural guaranties that a proposed settlement is
fair."  *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l,
Ltd.,* 247 F.R.D. 253, 269 (D. Mass. 2008) (citing 1 HERBERT B.
NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 3.31 (4th ed. 2002)
("When the class members are united in interest on the liability
issues but have potential conflicts regarding the nature of the
relief or the division of a monetary award, the court may avoid
the potential conflict by creating subclasses")).

I reject Hochstadt's contention that sub-classes should be
created in this case because the needs-based sub-classes he
proposes would not treat all class members in an equitable manner

-22-

and would make the distribution of the Settlement Amount unduly complicated.  Hochstadt cites no case law, and my research has not identified any, in which a court has certified sub-classes based on the personal needs of the class members rather than on their losses, which are at the core of their claims.  Hochstadt does not, in any event, offer a way to create sub-classes to reflect the greater needs of those of are "retired and approaching retirement."  Under these circumstances, I overrule Hochstadt's objection based upon a failure to create sub-classes in the present case.  Moreover, to the degree that the differentiation of claims that subclassing allows is appropriate, I find the Revised Plan of Allocation serves that purpose adequately.

### III.   PRELIMINARY FAIRNESS DETERMINATION

#### A.   *Legal Standard*

Pursuant to Rule 23(e), "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."  FED. R. CIV. P. 23(e).  When approving a settlement:

> [T]he judge is required to scrutinize the proposed
> settlement to ensure that it is fair to the persons whose
> interests the court is to protect. Those affected may be
> entitled to notice and an opportunity to be heard. This
> usually involves a two-stage procedure. First, the judge
> reviews the proposal preliminarily to determine whether
> it is sufficient to warrant public notice and a hearing.
> If so, the final decision on approval is made after the
> hearing.

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 13.14 (2004).  Therefore,

before making a final decision on the "approval" of a settlement, a court must first make a "preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms." *Id*. § 21.632.

While "policy encourages settlements, the burden remains on the proponents to show that the settlement is reasonable." *Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30, 44 (1st Cir. 2009) (internal citations omitted). "Rule 23's reasonableness standard has been given substance by case law offering laundry lists of factors, most of them intuitively obvious and dependent largely on variables that are hard to quantify." *Id*. Nonetheless, there is generally a presumption in favor of the settlement "[i]f the parties negotiated at arm's length and conducted sufficient discovery." *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 32-33 (1st Cir. 2009) (citing *City P'ship*, 100 F.3d at 1043)). More specifically, a presumption of fairness attaches to the court's preliminary fairness determination when "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Lupron Mktg. and Sales Practices Litig.*, 345 F. Supp. 2d 135, 137 (D. Mass. 2004) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768,

-24-

785 (3d Cir. 1995)).

**B.    *Application to the Amended Settlement Agreement***

    1.    <u>The Negotiations Occurred at Arms' Length</u>

    Plaintiff Hochstadt argues that the settlement agreement was the result of collusion and did not occur at arms' length.  The record shows otherwise.

    Even though the parties did not reach an agreement at that stage, settlement discussions began on February 10, 2009 during the pre-argument settlement conference at the Court of Appeals. The parties resumed settlement discussions on or about August 14, 2009.  During the month that followed, they exchanged multiple settlement proposals and involved Paul W. Sandman, Boston Scientific's general counsel, in the settlement negotiations.  On or about the evening of September 11, 2009, the parties reached an agreed compromise to settle the ERISA Actions.  Thereafter, the parties' counsel spent two months detailing the settlement terms.

    Under these circumstances, I find that the time spent and the efforts made by parties on both sides during the settlement negotiations are persuasive indicators that the Amended Settlement Agreement was not the result of collusion but rather the result of negotiations conducted at arms' length. Accordingly, I conclude that this requirement is satisfied.

## 2.   Sufficient Discovery Was Conducted

Plaintiff Hochstadt alleges that the proponents of the settlement cannot justify the Settlement Amount because the discovery has not been completed.  In doing so, Hochstadt misconceives the applicable standard, which does not require that discovery be completed, but rather that sufficient discovery be conducted to make an intelligent judgment about settlement.

Applying this standard, I find that sufficient discovery was undertaken.  Fact discovery began in 2006 with *ERISA I.*  When the parties engaged in fact discovery for *ERISA II*, they resumed fact discovery where they left off in *ERISA I* and adopted an aggressive schedule.  The parties' counsel agreed that all documents produced in *ERISA I* would be deemed produced in *ERISA II* and reviewed over three million pages of documents produced by Defendants.  Fact discovery also involved the deposition of several witnesses, including the Plan administrator and an outside consultant to the Plan.  Accordingly, I find that, given the thorough investigation of the facts over the last four years, this case is at a stage where both the court and counsel are able to evaluate the merits of the claims.

## 3.   The Proponents of the Settlement Are Experienced in Similar Litigation

The experience of co-lead counsel in this case is apparent from their prosecution of the ERISA Actions over the last four years.  They have worked from the inception of their pre-filing

factual investigation, filed the successive complaints and conducted discovery.  In addition, they have significant class action experience in ERISA and related investor disputes and in class action litigation generally.  Plaintiff Hochstadt recognizes that, in his words, "[t]here is no doubt that proposing counsel teams have extensive experience in the field." Accordingly, I am satisfied that the proponents of the settlement are experienced in similar litigation.

    4.    Number of Objections

    Because the notice to the Settlement Class has not yet been issued, this factor can only be assessed preliminarily based on the objection of Plaintiff Hochstadt.  To date, Hochstadt is the only known objector to the Amended Settlement Agreement. However, when the notice will be issued, other putative class members will be given a full opportunity to develop and lodge any objection.  In doing so, putative class members will be able to rely on the independent fiduciary's report, which will be made publicly available at least thirty days before the expiration of the deadline for objecting to the Amended Settlement Agreement.

    Whether a significant number of the class members will ultimately object to the Amended Settlement Agreement when it is proposed for final approval will be further discussed at that time.  At this point, there is but one objector, a party who has variously sought, then abandoned and then sought again

representative status.

Under these circumstances and for purposes of this preliminary review, I find the Amended Settlement Agreement to be fair, adequate and reasonable as a general proposition.  I turn now to specific objections.

## IV.   OBJECTIONS[13]

### A.   *Objection to the Proposed Settlement Amount*

Hochstadt first objects to the Settlement Amount, as defined in paragraph 1.1.37 of the Amended Settlement Agreement, which he considers to be "inadequate."  I find, however, that the amount of $8.2 million offered by Defendants is reasonable in light of the risks of continuing litigation.  As noted by Plaintiff Hazelrig, *ERISA I* has been dismissed and the outcome of the appeal from that dismissal remains unknown.  Both *ERISA I,* if reinstated, and *ERISA II* could face significant legal and factual hurdles in obtaining any recovery greater than the Settlement Amount.  In addition, I find the Settlement Amount to be reasonable in light of the best possible recovery.  While co-lead counsel preliminarily estimated damages at approximately $160 million based on a "lost opportunity" theory, that theory was rejected by Judge Tauro in *ERISA I* in favor of the "out-of-

---

[13]  Because Hochstadt is the only known objector at this stage, I address only his objections without prejudice to further consideration of these and other objections when confronting the question of final approval in connection with the Fairness Hearing.

pocket" theory, thereby reducing class members' prospect for
damages. *See In re Boston Scientific Corp. ERISA Litig.*, 254
F.R.D. at 28-32.  This prospect of more limited damages is also
reinforced by the fact that no loss was apparently sustained by
the litigation with Medinol, Ltd. or by the DOJ investigation
because the stock price did not decline when settlements with
Medinol and the DOJ were disclosed.  Damages obtainable at trial
would at best be limited to stock declines associated with the
TAXUS recalls and the FDA warning letters, which approximate $30
million.

        Moreover, as it bears noting, *see* Note 5 *supra*, that I have
today granted summary judgment for Defendants in the parallel
securities litigation on the TAXUS recall claim and that
Plaintiffs in that litigation had earlier abandoned the FDA
warning and other claims.  In short, the amount of $8.2 million,
which represents approximately 27% of the more conservatively
estimated $30 million loss, is plainly reasonable in a disputable
matter such as this.

        In sum, the risks of continuing litigation and the best
possible recovery make it uncertain, if not unlikely, that
Defendants would ever be required to pay more, through further
litigation than they are willing to pay now.  Accordingly, I find
the Settlement Amount to be reasonable.

B.    *Objection to the Revised Plan of Allocation*[14]

Hochstadt also objects to the proposed distribution of the Settlement Amount.[15] He argues that the Settlement Amount should be allocated to provide greater benefits to "those retired and approaching retirement."

As with the settlement itself, "the plan of allocation must be fair, reasonable, and adequate."  *In re Tyco Int'l, Ltd.*

---

[14]  As noted, the plan of allocation has been revised in response to my inquiries at the initial preliminary review hearing.  These revisions do not, however, entirely obviate Hochstadt's objection.

[15]  The revised plan of allocation provides the following damage calculation formula: "For each Participant, the Administrator shall determine the Participant's 'Recognized Claim' approximating the damages the Participant allegedly suffered."  Am. Settlement Agreement Ex. D., § II.C.  In doing so, the Administrator will take into consideration for each Participant the disclosure of discrete events.  *Id.* Additionally, the following limit will be imposed on Recognized Claims:  "For each Participant, the Administrator shall determine their overall market loss (the 'Net Market Loss') for the entire Class Period, as follows:  Net Market Loss = A + B - C - D, where for each Participant's account:

A = the dollar value of the Boston Scientific shares held in the Boston Scientific Stock Fund, if any, held for the Participant on the first day of the Class Period (valued at $39.50 per share);
B = the dollar value, if any, of all of the purchases of interests in the Boston Scientific Stock Fund during the Class Period as of the time of the purchase(s);
C = the dollar value, if any, of all dispositions of interests in the Boston Scientific Stock Fund during the Class Period as of the time of the sale(s); and
D = the dollar value of the Boston Scientific shares held in the Boston Scientific Stock Fund, if any, held for the Participant on the close of trading on the last day of the Class Period (valued at $21.87 per share).

*Id.* § II.D.  The entire Revised Plan of Allocation is attached as Exhibit A to this Memorandum and Order.

*Multidistrict Litig.*, 535 F. Supp. 2d 249, 262 (D. N.H. 2007).
For the reasons discussed in Section II.C. *supra* with respect to
subclasses, I disagree with Hochstadt that the proposed Plan of
Allocation should be based on the needs of the members of the
Settlement Class rather than on their losses.

Furthermore, I find the Revised Plan of Allocation to be
reasonable because its provides for payments of settlement
proceeds to class members based upon discrete disclosure events
that occurred during the Class Period.  Under this Revised Plan
of Allocation, Plan participants who held and purchased Boston
Scientific stock in the Plan prior to the various disclosures of
the TAXUS stent problems and FDA issues but did not sell until
after such disclosures were made, have "Recognizable Claims,"
whereas those who sold before the disclosures were made are not
entitled to receive any settlement proceeds.  In addition,
damages are limited to the actual market loss a Plan participant
actually incurred; therefore if the Plan participant had a market
gain, he will not be deemed not to have suffered any damages.

Under these circumstances and for purposes of this
preliminary review, I find the Revised Plan of Allocation to be
fair, reasonable, and adequate.  In addition, I note that, as
part of its review of the Amended Settlement Agreement, the
independent fiduciary will specifically review the allocation

formula for reasonableness and the results of that review will be available before the final fairness hearing is conducted.

**C.   *Objection to the Revised Class Notice***

Finally, Hochstadt argues that the proposed class notice is inappropriate because it does not clearly and concisely recite the distribution of the Amended Settlement Amount or any method for calibrating the apportionment of the proceeds in light of the age of the class members.

While it is not mandatory, "the court may direct appropriate notice to the class" certified under Rule 23(b)(1).  FED. R. CIV. P. 23(c)(2)(A).  Contrary to Hochstadt's allegations, I find the Revised Class Notice, as defined in Exhibit B.1 of the Amended Settlement Agereement, to be appropriate because it clearly provides background information on the ERISA Actions, accurately recites the legal rights and options of the Settlement Class and fully explains the Revised Plan of Allocation of the Settlement Amount in the light of the discrete disclosure events that occurred during the Class Period.

## V.   CONCLUSION

For the reasons set forth more fully above, I GRANT class certification of the Settlement Class, as defined in paragraph 1.1.29 of the Amended Settlement Agreement, and AUTHORIZE the publication of the Revised Class Notice, as defined in Exhibit B.1 of the Amended Settlement Agreement.  A Final Fairness

Hearing will be held before me in Courtroom 1 of the John Joseph

Moakley Courthouse in Boston at 2:30 p.m., August 5, 2010.




                                    */s/ Douglas P. Woodlock*
                                    DOUGLAS P. WOODLOCK
                                    UNITED STATES DISTRICT JUDGE

**EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HOCHSTADT, et al. | ) | |
| | ) | |
| v. | ) | 08-CV-12139-DPW |
| | ) | |
| BOSTON SCIENTIFIC CORPORATION, et al. | ) | |
| | ) | |

## [PROPOSED] PLAN OF ALLOCATION

I.   **Allocation of the Net Settlement Fund to the Proposed Class**

A.    If this Plan of Allocation is approved by the Court, then pursuant to Paragraph 3.5 of the Amended Stipulation, at a time following the Effective Date, the Net Settlement Fund shall be transferred by the Escrow Agent to the Plan for distribution to or for the benefit of Class Members, subject to this Plan of Allocation.   The Administrator shall then direct the Plan Trustee to allocate the Net Settlement Fund received by the Plan to the Proposed Class Members according to the allocation/calculation methods described herein.

B.    <u>Current Plan Participants.</u>  As promptly as possible after deposit of the Net Settlement Fund into the Plan, the Trustee of the Plan shall allocate into each current Plan Participant's account his or her Final Individual Dollar Recovery as calculated in the Plan of Allocation. Each current Plan Participant's Final Individual Dollar Recovery shall be allocated among the Participant's investment options in accordance with the existing investment elections then in effect and treated thereafter for all purposes under the Plan as assets of the Plan properly credited to that Participant's account. The Participant may

reallocate his or her Final Individual Dollar Recovery if and as then permitted by the Plan.

C.     Former Plan Participants.   For former Plan Participants who withdrew their accounts after the beginning of the Class Period but before the Effective Date of the Settlement, the Trustee of the Plan will establish an account for each former Plan Participant, and each former Participant will be notified of such account along with further instructions.  As promptly as possible after deposit of the Net Settlement Fund into the Plan, the Trustee shall allocate into each former Plan Participant's newly established account his or her Final Individual Dollar Recovery as calculated in this Plan of Allocation.  Each former Participant's Final Individual Dollar Recovery shall be allocated in its entirety to the investment option that the existing procedures of the Plan designates as the default option for current participants.

II.     Calculation of Allocation

A.     **Background**:  Damages were measured based on the price reaction of Boston Scientific stock to disclosures of information alleged in the Complaint. Information and disclosures regarding the U.S. Department of Justice ("DOJ") investigation dating from 1998, the lawsuit involving Medinol, the Taxus coronary stent system, and U.S. Food and Drug Administration ("FDA") actions were studied.  Events throughout the relevant period were studied to identify what information was related to the allegations in the Complaint.  The following events were determined to be related to allegations in the Complaint and were examined to assess their materiality based on the statistical significance of the stock price reaction that accompanied their disclosure. Stock price reactions were measured using standard event study methodology. Regression analysis was used to remove the effects of the market and industry on Boston

2

Scientific stock movements. The decline remaining after the removal of the market and industry effects is known as the "residual return." If the stock price reaction was statistically significant, then the residual return was used to calculate damages for that disclosure. If the price reaction was not statistically significant, no damages were attributed to the disclosure.

1. The Class Period begins on May 7, 2004 when the *Boston Globe* reported that a company spokesman for Boston Scientific stated that it would change the way it made parts of its Taxus coronary stent systems to address complications under review by government regulators. The *Boston Globe* reported that Boston Scientific said that the issue was relatively minor. There was no statistically significant reaction to this information.

2. On July 1, 2004, the FDA announced a Class 1 recall of Taxus Express2 Stent System. On July 2, 2004, Boston Scientific announced that it was voluntarily recalling 200 of its Taxus coronary stent systems due to characteristics found in two manufacturing lots of the stents. There was no statistically significant reaction to either the July 1, 2004 or the July 2, 2004 announcements.

3. On Friday, July 16, 2004, trading in Boston Scientific stock was halted until the Company announced that it was recalling an additional 96,000 coronary stents. This announcement caused a residual decline of 4.92%, or $1.99 per share, and was statistically significant.

4. The reaction to the July 16, 2004 announcement took more than a day as market participants worked to determine the overall effect the large recall would have on Boston Scientific and its share of the stent market. The stock price continued to decline on Monday, July 19, 2004, when the company pushed back its quarterly earnings conference from July 19, 2004 to July 26, 2004. The residual decline on July 19, 2004 was 3.09%, or $1.16 per share, and was statistically significant. Independent, contemporaneous news accounts attributed the decline on July 19, 2004 to the announcement of July 16, 2004 regarding the stent recall.

5. On July 20, 2004, the *Wall Street Journal* ("*WSJ*") reported that the U.S. Food and Drug Administration was reviewing Boston Scientific's recall of 96,000 stents to assess whether the company was doing enough to protect people. This article was available before the market opened. The article stated that the director of the FDA's office for device evaluation told the newspaper the FDA was

3

conducting a "top priority" review of the recall and had asked Boston Scientific to provide more information on how it determined which stents were safe, the *WSJ* reported. In response to this information Boston Scientific stock had a residual decline of 4.84%, or $1.75 per share, which was statistically significant.

6.   During the trading day on August 5, 2004, Boston Scientific announced a further expanded recall of its Taxus coronary stent system to include an additional 3,000 stents. In reaction to this announcement Boston Scientific stock had a residual decline of 4.01%, or $1.45 per share, which was statistically significant.

7.   On February 24, 2005, the *WSJ* reported, based on confidential sources, that Boston Scientific and the DOJ had reached a settlement of the DOJ investigation in connection with a 1998 recall. The DOJ investigation had taken place over six years. The *WSJ* further reported that the settlement included a $70 million payment by Boston Scientific. The *WSJ* article and reports of it in other news media were available during the trading day. The response to this announcement was not statistically significant.

8.   On May 18, 2005, August 1, 2005, and August 10, 2005, the FDA issued separate Warning Letters to Boston Scientific. The May 18, 2005 Warning Letter was posted on the FDA Web site on May 31, 2005. The response to this disclosure was not statistically significant. The August 1, 2005 Warning Letter was posted on the FDA Web site on August 16, 2005. The response to this disclosure was not statistically significant.

9.   After the market closed on August 12, 2005, Boston Scientific issued an update on its litigation with Medinol in which it stated that a settlement had not been reached. The response to this announcement was not statistically significant. After the market closed on September 21, 2005, Boston Scientific and Medinol announced the settlement of their dispute in which Boston Scientific agreed to, among other things, pay Medinol $750 million. The response to this announcement was not statistically significant.

10. On August 23, 2005, before the opening of trading, the August 10, 2005 Warning Letter was posted on the FDA Web site. In response to this disclosure Boston Scientific stock had a residual decline of 4.07%, or $1.11 per share, which was statistically significant.

11. After the markets closed on January 26, 2006, Boston Scientific announced that it had received an FDA Warning Letter identifying "serious regulatory problems" in

4

medical devices produced at three facilities and stating that the company's
previous efforts to address quality control problems were inadequate. In after
hours trading, Boston Scientific stock dropped 2.4%, $0.55 per share, from a
close of $23.15 to $22.60 per share, which was statistically significant.

B.     **Damage Elements:**  For purposes of this Plan of Allocation, Damages per

share will be based on the following residual declines:

| | | |
|---|---|---|
| a. | July 16, 2004: | $1.99 |
| b. | July 19, 2004: | $1.16 |
| c. | July 20, 2004: | $1.75 |
| d. | August 5, 2004: | $1.45 |
| e. | August 23, 2005: | $1.11 |
| f. | January 26, 2006: | $0.55 |
| | Total: | $8.01 |

Damages per share depend on when the shares were purchased and/or sold.
Damages for shares held as of the beginning of the Class Period are calculated
based on the closing price of Boston Scientific stock on May 6, 2004 [the last
trading day before the start of the Class Period] of $39.50 per share as their
opening value. Only shares purchased before the July 16, 2004 announcement,
and held after the close of trading[1] on January 26, 2006, will have incurred the
maximum of $8.01 of damages per share. If shares were both purchased and sold
before a corrective disclosure, they incurred no damage. For administrative
convenience, when an allegedly corrective disclosure was made during the trading
day, purchases at prices above the mid-point of the drop from the prior close to
the announcement day's close are assumed to have been made prior to the
corrective disclosure.

C.     **Damage calculation formulas:**  For each Participant, the Administrator

shall determine the Participant's "Recognized Claim" approximating the damages the

Participant allegedly suffered. The Net Settlement Proceeds will be distributed *pro rata*

to Class Members in proportion to each Class Member's Recognized Claim compared to

---

[1]        Close of trading means 4:00 p.m. Eastern Time.

the "Total Recognized Claims" of all Class Members.  Each Participant's Recognized

Claim will be calculated as follows:

1. **Recognized Claims for shares held as of the beginning of the Class Period and:**

    A. sold before the July 16, 2004 announcement are $0.00 (zero);

    B. sold on July 16, 2004, after the announcement, are the lesser of: i) $39.50 per share minus the sale price; or ii) $1.99 per share;

    C. sold on July 19, 2004 are the lesser of: i) $39.50 per share minus the sale price; or ii) $3.15 per share ($1.99 plus $1.16);

    D. sold from July 20, 2004 through before the disclosure made on August 5, 2004[2] are the lesser of: i) $39.50 per share minus the sale price; or ii) $4.90 per share ($1.99 plus $1.16 plus $1.75);

    E. sold from after the disclosure made on August 5, 2004 through August 22, 2005 are the lesser of: i) $39.50 per share minus the sale price; or ii) $6.35 per share ($1.99 plus $1.16 plus $1.75 plus $1.45);

    F. sold from August 23, 2005 through the close of trading on January 26, 2006 are the lesser of: i) $39.50 per share minus the sale price; or ii) $7.46 per share ($1.99 plus $1.16 plus $1.75 plus $1.45 plus $1.11); or

    G. retained as of the close of trading on January 26, 2006 are $8.01 per share ($1.99 plus $1.16 plus $1.75 plus $1.45 plus $1.11 plus $0.55).

2. **Recognized Claims for shares purchased from May 7, 2004 through before the July 16, 2004 announcement and:**

    A. sold before the July 16, 2004 announcement are $0.00 (zero);

    B. sold on July 16, 2004 after the announcement are the lesser of: i) the purchase price minus the sale price; or ii) $1.99 per share;

    C. sold on July 19, 2004 are the lesser of: i) the purchase price minus the sale price; or ii) $3.15 per share ($1.99 plus $1.16);

    D. sold from July 20, 2004 through before the disclosure made on August 5, 2004 are the lesser of: i) the purchase price minus the sale price; or ii) $4.90 per share ($1.99 plus $1.16 plus $1.75);

    E. sold after the disclosure on August 5, 2004 through the close of trading on August 22, 2005 are the lesser of: i) the purchase price minus the

---

    [2]    Shares purchased on August 5, 2004 for prices above $35.11 per share (the mid-point between the closing price of $36.31 per share on August 4, 2004 and the closing price on August 5, 2004 of $33.90 per share) will be deemed to have been purchased prior to the announcement.

sale price; or ii) $6.35 per share ($1.99 plus $1.16 plus $1.75 plus $1.45);

F.  sold from August 23, 2005 through the close of trading on January 26, 2006 are the lesser of: i) the purchase price minus the sale price; or ii) $7.46 per share ($1.99 plus $1.16 plus $1.75 plus $1.45 plus $1.11); or

G.  retained as of the close of trading on January 26, 2006 are the lesser of: i) the purchase price minus $21.87 per share; or ii) $8.01 per share ($1.99 plus $1.16 plus $1.75 plus $1.45 plus $1.11 plus $0.55).

3.  **Recognized Claims for shares purchased on July 16, 2004 after the announcement and:**

a.  sold on July 16, 2004 are $0.00 (zero) per share;

b.  sold on July 19, 2004 are the lesser of: i) the purchase price minus the sale price; or ii) $1.16 per share;

c.  sold from July 20, 2004 through before the disclosure on August 5, 2004 are the lesser of: i) the purchase price minus the sale price; or ii) $2.91 per share ($1.16 plus $1.75);

d.  sold after the disclosure on August 5, 2004 through the close of trading on August 22, 2005 are the lesser of: i) the purchase price minus the sale price; or ii) $4.36 per share ($1.16 plus $1.75 plus $1.45);

e.  sold from August 23, 2005 through the close of trading on January 26, 2006 are the lesser of: i) the purchase price minus the sale price; or ii) $5.47 per share ($1.16 plus $1.75 plus $1.45 plus $1.11); or

f.  retained as of the close of trading on January 26, 2006 are the lesser of: i) the purchase price minus $21.87 per share; or ii) $6.02 ($1.16 plus $1.75 plus $1.45 plus $1.11 plus $0.55).

4.  **Recognized Claims for shares purchased on July 19, 2004 and:**

a.  sold on July 19, 2004 are $0.00 (zero) per share;

b.  sold from July 20, 2004 through before the disclosure on August 5, 2004 are the lesser of: i) the purchase price minus the sale price; or ii) $1.75 per share;

c.  sold after the disclosure on August 5, 2004 through the close of trading on August 22, 2005 are the lesser of: i) the purchase price minus the sale price; or ii) $3.20 per share ($1.75 plus $1.45);

d.  sold from August 23, 2005 through the close of trading on January 26, 2006 are the lesser of: i) the purchase price minus the sale price; or ii) $4.31 per share ($1.75 plus $1.45 plus $1.11); or

e.  retained as of the close of trading on January 26, 2006 are the lesser of: i) the purchase price minus $21.87 per share; or ii) $4.86 per share ($1.75 plus $1.45 plus $1.11 plus $0.55).

7

5. **Recognized Claims for shares purchased from July 20, 2004 through before the disclosure on August 5, 2004**:
   a. sold from July 20, 2004 through before the disclosure on August 5, 2004 are $0.00 (zero) per share;
   b. sold after the disclosure on August 5, 2004 through the close of trading on August 22, 2005 are the lesser of: i) the purchase price minus the sale price; or ii) $1.45 per share;
   c. sold from August 23, 2005 through the close of trading on January 26, 2006 are the lesser of: i) the purchase price minus the sale price; or ii) $2.56 per share ($1.45 plus $1.11); or
   d. retained as of the close of trading on January 26, 2006 are the lesser of: i) the purchase price minus $21.87 per share; or ii) $3.11 per share ($1.45 plus $1.11 plus $0.55).

6. **Recognized Claims for shares purchased after the disclosure on August 5, 2004 through the close of trading on August 22, 2005 and**:
   a. sold on August 5, 2004 through the close of trading on August 22, 2005 are $0.00 (zero);
   b. sold from August 23, 2005 through the close of trading on January 26, 2006 are: i) the lesser of the purchase price minus the sale price; or ii) $1.11 per share; or
   c. retained as of the close of trading on January 26, 2006 are the lesser of: i) the purchase price minus $21.87 per share; or ii) $1.66 per share ($1.11 plus $0.55).

7. **Recognized Claims for shares purchased from August 23, 2005 and the close of the market on January 26, 2006 and**:
   a. sold between August 23, 2005 and the close of the market on January 26, 2006 are $0.00 (zero); or
   b. retained as of the close of trading on January 26, 2006 are the lesser of: i) the purchase price minus $21.87 per share; or ii) $0.55 per share.

D.   **Limit on Recognized Claims:** For each Participant, the Administrator shall determine their overall market loss ("Net Market Loss") for the entire Class Period, as follows:  Net Market Loss = A + B - C - D, where, for each Participant's account:

1.   A = the dollar value of the Boston Scientific shares held in the Boston Scientific Stock Fund, if any, held for the Participant on the first day of the Class Period (valued at $39.50 per share);

8

2.      B = the dollar value, if any, of all of the purchases of interests in the Boston Scientific Stock Fund during the Class Period as of the time of purchase(s);

3.      C = the dollar value, if any, of all dispositions of interests in the Boston Scientific Stock Fund during the Class Period as of the time of the sale(s); and

4.      D = the dollar value of the Boston Scientific shares held in the Boston Scientific Stock Fund, if any, held for the Participant on the close of trading on the last day of the Class Period (valued at $21.87 per share).

Participants whose Net Market Losses are negative (that is, they received a gain rather than a loss as a result of the calculations above) are excluded from further calculations under this Plan of Allocation and such Participants shall receive no payment from the Net Settlement Fund. Participants whose Net Market Losses are less than their Recognized Claim amounts as calculated above, shall have their Recognized Claim amount reduced to their Net Market Loss.

E.      The Recognized Claims of the Participants as calculated above will be aggregated to yield a Total Recognized Claim of the Plan as a whole over the Class Period (the "Plan's Recognized Claim").

F.      The Administrator shall calculate for each Participant his or her "Net Loss Percentage" of the Plan's Loss by dividing each Participant's Recognized Claim by the Plan's Recognized Claim.

G.      The Administrator shall then calculate for each Participant his or her "Preliminary Individual Dollar Recovery", or personal share of the Net Settlement Fund, by multiplying the Participant's Net Loss Percentage by the Net Settlement Fund.

H.      The Administrator shall identify all Participants whose Preliminary Individual Dollar Recovery is less than or equal to ten dollars ($10.00) (the "*De Minimis*

9

Amount"). All Participants whose Preliminary Individual Dollar Recovery is less than or equal to the *De Minimis* Amount shall be deemed to have a Final Individual Dollar Recovery of zero ($0.00).

I.    The Administrator shall then recalculate the Net Loss Percentages of the Participants whose Preliminary Individual Dollar Recovery was greater than the *De Minimis* Amount by omitting from the recalculation those Participants whose Preliminary Individual Dollar Recovery was equal to or less than the *De Minimis* Amount, so as to arrive at each such Participant's "Final Individual Dollar Recovery". The sum of the Final Individual Dollar Recoveries must equal the Net Settlement Fund.

J.    If any Participant with a Final Individual Dollar Recovery greater than zero cannot be located despite reasonable efforts, such Participant's Final Individual Dollar Recovery shall be administered in accordance with the existing procedures of the Plan regarding un-locatable participants. If any Participant with a Final Individual Dollar Recovery greater than zero is deceased, such Participant's Final Individual Dollar Recovery shall be administered in accordance with the existing procedures of the Plan regarding deceased participants. If a Qualified Domestic Relations Order is in effect which applies to a Participant the procedures of the Plan regarding Qualified Domestic Relations Orders shall apply.

K.    At least fifteen (15) days before the allocation to eligible Participants, the Administrator shall provide to Counsel for Defendants and Plaintiffs' Co-Lead Counsel the methodology used in calculating the Participants' Recognized Claims as described herein (or otherwise modified) as well as a sampling of the summaries, compilations, calculations, or tabulations of the claims and amounts described herein, including a

10

complete listing setting out the dollar amount ultimately allocated to each eligible Participant.

## III.    Qualifications and Continuing Jurisdiction

A.    In light of the manner in which the data is kept and the ease with which it can be manipulated, it may be appropriate to simplify some of the features of these calculations. Such simplifications are acceptable as long as the two basic features of the distribution are preserved: (1) that each Participant receives a share of the Net Settlement Fund based approximately on the decline in the value of Boston Scientific common stock he or she held during the Class Period attributable to the alleged damages in comparison with the decline in value of Boston Scientific common stock held by others in the Plan attributable to the alleged damages; and (2) that the distribution take place through the Plan so as to realize the tax advantage of investment in the Plan. Any such changes will be presented to the Court for approval.

B.    The Court will retain jurisdiction over the Plan of Allocation to the extent necessary to ensure that it is fully and fairly implemented. In particular, the Court will retain jurisdiction to evaluate the efforts of Plaintiffs' Co-Lead Counsel to identify and notify Participants who are entitled to receive a share of the Settlement. Plaintiffs' Co-Lead Counsel will report to the Court within a reasonable time of the efforts that have been undertaken.

11